ELISABETH F. S. SOLOMON *v.*
ROSALIE ABERMAN ET AL.

ELISABETH F. S. SOLOMON *v.* DAVID R. LEVETT
(12036)
(12592)

HEALEY, PARSKEY, SHEA, DANNEHY and SATTER, Js.

Argued February 8—decision released June 4, 1985

*William J. Doyle,* with whom were *Patrick M. Noonan* and, on the brief, *Arnold J. Bai,* for the appellants (defendants in the first case) and the appellee (defendant in the second case).

*David P. Burke,* with whom, on the brief, were *David S. Maclay* and *Suzanne E. Baldesare,* for the appellee (plaintiff in the first case).

*A. Reynolds Gordon,* with whom, on the brief, was *Arthur A. Hiller,* for the appellant (plaintiff in the second case).

ARTHUR H. HEALEY, J. The appeals here from decisions in two actions filed by the plaintiff are discussed separately.

I

(Solomon v. Aberman and Levett)

This is an appeal from an order granting a prejudgment remedy to the plaintiff, Elisabeth F. S. Solomon, against the defendants, Rosalie Aberman and David R. Levett. This legal controversy involves events surrounding the plaintiff's discharge from all the positions held by her with the Hall-Brooke Foundation (Hall-Brooke). On this appeal, the defendants attack the trial court's findings of fact and conclusions of law. They specifically claim that: the trial court's opinion is infected with a multitude of factual errors; the trial court failed to consider and weigh all the evidence before granting a prejudgment remedy; the trial court misstated and inappropriately expanded the law of individual liability for corporate acts; the trial court misapplied the law of wrongful discharge; a prejudgment remedy hearing is an inappropriate forum for significant expansion of the law; no evidence exists to support the only cognizable claims, i.e., tortious interference with contractual and beneficial relation-

ships; and the evidence does not support the trial court's finding of potential damages.[1]

The plaintiff's complaint and affidavit in support of her request for a prejudgment remedy; General Statutes § 52-278c; charge that these defendants had tortiously interfered with her contractual and beneficial relationships with Hall-Brooke. These as well as documents presented and testimony elicited over seven days of the hearing on the plaintiff's application for a prejudgment remedy included the following circumstances. The plaintiff is an accredited professional hospital administrator who owned and operated the Hall-Brooke Hospital in Westport which, in 1966, she transferred to the Hall-Brooke Foundation, Inc. In return, it was agreed that she would be employed by Hall-Brooke as its executive director and chief administrative officer until she either reached age sixty-five or retired. The plaintiff also leased the hospital buildings and realty to Hall-Brooke. In 1969, she became a "sustaining" lifetime member of Hall-Brooke's board of trustees as well as its treasurer; these positions were held by her in addition to the executive director post.

The defendant Aberman was hired in 1976 to work at Hall-Brooke in a position subordinate to that of the plaintiff. She is not an accredited hospital administrator. After the trustees granted the plaintiff's request in 1979 for a leave of absence from her position as Hall-Brooke's executive director, Aberman was appointed as acting executive director specifically for the dura-

[1] We construe the broadside attack upon the trial court's findings of fact and conclusions of law as constituting a claim that the trial court erred in finding that there was probable cause. We do so because if the trial court's finding of probable cause was not "clear error"; see *Three S. Development Co.* v. *Santore,* 193 Conn. 174, 176, 474 A.2d 795 (1984); the defendants' claims here must fail.

We note that the appeal in the companion case against the trustees of the Hall-Brooke Foundation, Inc., *Solomon* v. *Pettitt,* was withdrawn shortly before oral argument after all the briefs were filed.

tion of the term of the plaintiff's leave of absence.[2] While on leave, the plaintiff, with the approval of the trustees, held a newly created position as planning director of Hall-Brooke, also retaining her positions as trustee and treasurer. For the few months after the August, 1979 trustees' meeting until about February or March, 1980, the plaintiff and Aberman seemed to work amicably as they had done in the past. Problems then arose between Aberman and the plaintiff, and on May 22, 1980, the board voted to discharge the plaintiff from all her positions with Hall-Brooke. The defendant Levett, a partner in the law firm of Cummings & Lockwood, which represented Hall-Brooke at that time, handled the firm's Hall-Brooke account prior to and at the time of the plaintiff's discharge. Within nine months after the plaintiff's discharge, Hall-Brooke became a client of a newly formed law firm of which Levett was a founding partner.

The plaintiff instituted the present action against these defendants alleging tortious interference of contractual and beneficial relations with Hall-Brooke. After seven days of hearing on the plaintiff's request for a prejudgment order, covering over 1300 pages of transcript and at which in excess of fifty exhibits were introduced, the trial court found probable cause and granted the request, which involved attachment of the defendants' real property.

We have recently examined the trial court's function in considering an application for prejudgment remedy of attachment: "The language of our prejudgment rem-

---

[2] In his letter of October 12, 1979, to Aberman, Linsley A. Pettitt, chairperson of the board of Hall-Brooke, verifying Aberman's appointment as executive director "with first term ending on March 1st, 1982," wrote: "Since Mrs. Elizabeth [sic] F. S. Solomon is on a leave of absence from the Executive Directorship, it is important that the Hospital License, the American Hospital Association-Connecticut Hospital Association Annual Report and the School License, remain without change, listing her as Chief Executive Officer. . . ."

edy statutes; General Statutes § 52-278a et seq.; requires that the court determine 'whether or not there is probable cause to sustain the validity of the plaintiff's claim'; General Statutes § 52-278d (a); that is to say 'probable cause that judgment will be rendered in the matter in favor of the plaintiff.' General Statutes § 52-278c (a) (2). 'The legal idea of probable cause is a *bona fide* belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.' *Wall* v. *Toomey,* 52 Conn. 35, 36 (1884). Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. *Texas* v. *Brown,* 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983). The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim. *Ledgebrook Condominium Assn., Inc.* v. *Lusk Corporation,* 172 Conn. 577, 584, 376 A.2d 60 (1977). The court's role in such a hearing is to determine probable success by weighing probabilities. *Michael Papa Associates* v. *Julian,* 178 Conn. 446, 447, 423 A.2d 105 (1979)." *Three S. Development Co.* v. *Santore,* 193 Conn. 174, 175–76, 474 A.2d 795 (1984); see also *Babiarz* v. *Hartford Special, Inc.,* 2 Conn. App. 388, 393, 480 A.2d 561 (1984).

Although the hearing on an application for a prejudgment remedy "is not a trial on the merits"; *Michael Papa Associates* v. *Julian,* supra, 447; the trial court "must weigh the plaintiff's affidavit and the oral testimony and the documentary proof submitted by both parties." *William M. Raveis & Associates, Inc.* v. *Kimball,* 186 Conn. 329, 333, 441 A.2d 200 (1982) (tortious interference with contractual relationship alleged).

We have also stated that "[t]his court's role on review is very circumscribed." *Three S. Development Co.* v. *Santore,* supra, 176. In its determination of probable cause, "the trial court is vested with broad discretion which is not to be overruled in the absence of clear error. *Augeri* v. *C. F. Wooding Co.,* 173 Conn. 426, 429, 378 A.2d 538 (1977)." *Three S. Development Co.* v. *Santore,* supra. Since *Augeri* v. *C. F. Wooding Co.,* supra, we have consistently enunciated our standard of review in these matters. " 'In the absence of clear error, this court should not overrule the thoughtful decision of the trial court, which has had an opportunity to assess the legal issues which may be raised and to weigh the credibility of at least some of the witnesses.' " *Three S. Development Co.* v. *Santore,* supra; *William M. Raveis & Associates, Inc.* v. *Kimball,* supra, 333; *Babiarz* v. *Hartford Special, Inc.,* supra, 392–94; see also *Michael Papa Associates* v. *Julian,* supra, 447. At this time, therefore, we need only decide whether the trial court's conclusions were reasonable under the "clear error" standard.

The gravamen of the plaintiff's complaints against these two defendants, as well as the basis upon which the trial court ordered the prejudgment remedy, was that they had tortiously interfered with the plaintiff's contractual and beneficial relations with Hall-Brooke. "This court has long recognized a cause of action for tortious interference with contract rights or other business relations." (Citations omitted.) *Blake* v. *Levy,* 191 Conn. 257, 260, 464 A.2d 52 (1983). The essential elements of such a claim include, of course, the existence of a contractual or beneficial relationship and that the defendant(s), "knowing of that relationship, intentionally sought to interfere with it; and, as a result, the plaintiff claimed to have suffered actual loss." *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.,* 169 Conn. 407, 415, 363 A.2d 86 (1975).

" '[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously.' (Citations omitted.)." *Blake* v. *Levy,* supra, 261, quoting *Kecko Piping Co.* v. *Monroe,* 172 Conn. 197, 201–202, 374 A.2d 179 (1977); see also *Jones* v. *O'Connell,* 189 Conn. 648, 650, 458 A.2d 355 (1983). The burden is on the plaintiff "to plead and prove at least some improper motive or improper means"; *Blake* v. *Levy,* supra, 262; on the part of the defendants.

The trial court found and the parties appear to agree that the plaintiff had a contractual and beneficial relationship with Hall-Brooke, a nonprofit corporation which now operates a psychiatric hospital and school in Westport. The plaintiff was the founder of Hall-Brooke and had been its executive director from 1966 to 1979. The trial court found that the 1966 agreement between the plaintiff and Hall-Brooke provided that the plaintiff would transfer the hospital, along with its license and leasehold interest, to the foundation. Hall-Brooke in turn agreed "to employ Solomon as its Executive Director and primary administrative officer until age 65 or retirement, whichever event occurs sooner." The contract also provided that the "[Hall-Brooke] Foundation may terminate this agreement if Solomon has been adjudicated in a criminal court of competent jurisdiction as guilty of theft, fraud or embezzlement regarding the assets of [the] Foundation or regarding her employment." The plaintiff also leases to Hall-Brooke the real estate, buildings, fixtures, and equipment used in its hospital and school. The trial court also found that the plaintiff, in 1969, had become, in addition to executive director, both "a sustaining member of the Board of Directors to serve until she

resigned or became otherwise unqualified," and treasurer of Hall-Brooke, a post which she had held throughout and to which, in 1979, she had been reelected. After her discharge, the plaintiff was dismissed from all the positions she held with Hall-Brooke.

The defendants do not claim on appeal that they had no knowledge of the plaintiff's contractual or beneficial relationships at issue. The defendant Aberman at the time of the prejudgment remedy hearings was still the acting executive director of the Hall-Brooke Foundation. At the time the board of trustees had voted to discharge the plaintiff, on May 22, 1980, she was the acting executive director, a position she had held since late 1979, or early 1980, and the defendant Levett had been for several years a partner in the law firm of Cummings & Lockwood, which represented Hall-Brooke in its corporate legal affairs since 1976. Levett knew the plaintiff because of that representation. He was familiar with her employment contract with Hall-Brooke.

On August 16, 1979, the plaintiff, after discussions with the board, wrote and requested a leave of absence from her position as executive director. She also indicated to that board that she was willing to assume the position of director of planning until she resumed her position as executive director, noting in a letter to the chairman of the board that "[t]his temporary assignment will be from March 1st, 1980 to February 28th, 1982." In addition, she stated in the same letter that "[t]he existing Employment Agreement remains in effect and I reserve all rights accordingly." On August 16, 1979, there was a regular meeting of the board at which, inter alia, the plaintiff and the defendants Levett and Aberman were present.[3] The chairper-

---

[3] The defendant Aberman attended as a member of the board of trustees "ex officio" and the defendant Levett was "in attendance by invitation." At that meeting, Ramon Nicholl and Ronald M. Gilbert were elected trustees.

son, Leo S. Schnitzer, recommended that the plaintiff accept the position of director of planning of Hall-Brooke "during her leave-of-absence," and she indicated her willingness to serve in that capacity. The minutes of that meeting also state that Schnitzer asked "that the trustees approve Mrs. Solomon's request for a leave-of-absence on the understanding that her regular employment contract with the Foundation would remain unaffected by such action" and that he "presented a letter signed by the Chairperson and Mrs. Solomon acknowledging the foregoing understanding." The following motion then "unanimously carried":[4] "RESOLVED, that the Board of Trustees of the Foundation hereby authorizes and approves granting Elisabeth F. S. Solomon a leave-of-absence until March 1, 1982 from her duties as Executive Director of the Foundation, it being understood that this leave-of-absence shall not affect the terms and conditions of her employment contract with the Foundation."

As we have indicated, the plaintiff and Aberman worked together with little problem until early 1980. In March, 1980, a problem arose concerning the plaintiff's request for and receipt of a salary increase from $75,000 to $100,000 per annum. Although the increase requested had been paid since January, 1980, the problem arose when Aberman learned of an IRS restriction on the increase with which she was not familiar earlier. In the past, salary increases for employees had been granted by approving the budget presented to the

---

[4] The following members of the board of trustees were present at this meeting: Leo S. Schnitzer, Elisabeth F. S. Solomon, Frederick T. Jackson, Eugene J. Sheridan, Linsley A. Pettitt, Luis J. A. Villalon, Rosalie Aberman, ex officio.

The minutes of the meeting also state that the "Chairperson [Schnitzer] noted [sic] that Ms. Rosalie Aberman was being considered for the position of Executive Director of the Foundation in Mrs. Solomon's absence, and that the trustees would probably be asked to consider her appointment to this office at the next meeting."

board by the executive director without any specification of a particular increase for any particular employee, including the executive director. Aberman contacted Pettitt, who had been elected chairperson of the board of trustees at the August 16, 1979 meeting, concerning this. Although he had been a member of the board when salary increases were given in the budget without specification of any particular recipient, Pettitt now indicated his disapproval of the method used for approving such an increase as well as his intention to change that method. Responding to Pettitt's objections at a meeting of the finance committee in late April, 1980,[5] the plaintiff refused his request to return the money until the matter was heard by the board of trustees. At that meeting of the finance committee, it was agreed that Aberman would draft a summary of the job description for the plaintiff's position of director of planning. The lack of such a job description had caused problems.

Following that meeting, Pettitt met at the offices of Cummings & Lockwood on May 14, 1980, with Levett (and two associates of his law firm), Aberman, and certain members of the board whom Pettitt had called to attend.[6] The plaintiff and one or two other members of the board were not invited to attend. Levett had conferred with Aberman prior to that meeting. Levett said that this was not a board meeting, but rather a meeting to determine whether a board meeting should be held, that Pettitt had called him before the meeting to discuss the "continuing problems" at Hall-Brooke, that the problems "were now so intense that [Pettitt] felt that something had to be done," and that Pettitt wanted to discuss it "amongst the Directors and receive

---

[5] Levett, Aberman, Pettitt, Jackson and Mr. Klein, an accountant, were present at the April, 1980 finance committee meeting.

[6] Levett testified that that meeting was attended by himself, Jackson, Aberman, and he believed Mr. Nicholl and two associates from Cummings & Lockwood.

some legal advice as to what the options were for the Board." The matter of the disruption in the operations at Hall-Brooke and the "alternative means of dealing with that problem" were, Levett said, the subject of that meeting. As a result of the meeting of May 14, 1980, Levett and at least two of his legal associates were to gather materials that would bear on the plaintiff's status with Hall-Brooke, and "were involved with assembling a summary of conduct [of the plaintiff], drafting a notice of the meeting and finalizing research on the questions of law that the Trustees had presented to us and [sic] anticipated would be presented at that board meeting."[7] So far as Levett knew no one told the plaintiff, prior to her receiving notice of the board meeting called for May 22, 1980, that a summary of (her) conduct was being prepared. At the prejudgment remedy hearing, Levett testified that prior to the May 14, 1980 meeting he thought that some work had already been done "as far as assembling the material for the Summary of Conduct," and that insofar as he knew no one had informed the plaintiff even prior to the May 14 meeting that her dismissal from "all of her positions with the Foundation was under consideration."

At the conclusion of the May 14, 1980 meeting, the decision was made to call a special meeting of the board for May 22, 1980, to consider terminating the services

---

[7] On cross-examination of Levett, the following took place concerning the legal memorandum presented at the May 22, 1980 meeting which is Exhibit J:

"Q. Mr. Levett, this memorandum is dated May 14, 1980. So you already had the memorandum, a thirty-one page memorandum, already prepared at the time of the meeting with [a] few of the Board members at your office on the 14th; is that correct?

"A. I assume so.

"Q. So, actually, you had been asked prior, even to that meeting at your office, to start gathering together, not only the factual basis to support a discharge, but the legal basis to support a discharge?

"A. Yes."

of the plaintiff as executive director, director of planning, trustee and treasurer. The assembling of the summary of conduct proceeded. This summary consisted of memoranda from Aberman to the plaintiff "with some, but not all, of the replies[8] [thereto] from the plaintiff, with all of the memoranda dating from April 1 [1980] to May 14, 1980."[9] This exhibit, which was prepared by Levett with materials furnished by Aberman, opens with the statement that "[i]n connection with a Special Meeting of the Board of Trustees of Hall-Brooke Foundation to be held on May 22, 1980, certain trustees have requested that counsel prepare a summary of conduct by Elisabeth F.S. Solomon bearing upon the issues of her status as an officer, trustee, and employee. This summary and other information presented to the meeting will be evaluated by the Board to determine whether such conduct constitutes insubordination and interference by Elisabeth F. S. Solomon with the management of Hall-Brooke Foundation." Thereafter, ten designated areas are enumerated in this summary which the trial court said "formed the basis for the 'charges' against the plaintiff." On May 19,

---

[8] At the hearing on the prejudgment remedy application, the plaintiff introduced certain exhibits not included in the Summary of Conduct and which the plaintiff claimed were relevant and went to selectivity of its compilation.

[9] The summary of conduct includes approximately fifty "documents" in addition to a ten page preface enumerating the documents and the purpose of the summary.

This document contained the following index:
"INDEX TO ATTACHMENTS
"1. Refusal to deal with Executive Director
"2. Director of Planning job description dispute
"3. Salary increase request
"4. Retention of minute books
"5. Retention of budget documents
"6. Retention of signature stamp
"7. Unauthorized outside contacts
"8. Retention of Cost Commission files
"9. Unauthorized press release
"10. Collection dispute"

1980, the plaintiff received notice of the meeting to be held on May 22, 1980, and on May 20, 1980, she received notice of the "charges."

The plaintiff attended the special meeting on May 22, 1980. Her request to continue the meeting for two weeks in order to prepare her defense was denied on Levett's advice. Her request to tape the meeting as had been done in the past was also denied on Levett's advice. The "charges" referred to in the summary of conduct were explored at this meeting.

During the meeting which lasted about two and one-half hours, she spoke and was questioned by board members and by Levett. The defendant Aberman also spoke. Dr. Theodore Zanker, the medical director at Hall-Brooke, and Seth Berman, the director of the school there, also addressed the board.[10] Zanker stated at that meeting that the situation was "intolerable and he would not be responsible for patient safety if drastic action was not taken." At that time Berman said that "there were problems created by the plaintiff's actions which interfered with the efficient administration of the program that he directed." The trial court noted that there was no testimony that either Zanker or Berman had brought any complaints to the board of the plaintiff's conduct prior to the meeting of May 22, 1980. Two secretaries from Aberman's office also told the board that while Aberman was on vacation, the plaintiff had been seen at Aberman's files and that "later files were found to be missing."

At that meeting, Levett also circulated a legal opinion some thirty pages long, dated May 14, 1980, which the trial court characterized as "suggesting that the plaintiff's contract with the [Hall-Brooke] Foundation

---

[10] Neither Zanker, who had become medical director early in 1982, nor Berman testified at the hearing on the application for the prejudgment remedy.

as Executive Director and her position as Trustee were illegal." At the end of this meeting, the board voted to remove the plaintiff as executive director, director of planning, trustee and treasurer of Hall-Brooke.

The trial court's position that there was neither any attempt to consider a less drastic alternative than the plaintiff's discharge as "suggested" at the May 14, 1980 meeting nor any attempt made on the part of individual directors to "verify the charges made by the defendants Aberman and Levett" is sustainable on the law and the evidence.

Upon our review of the record in this case, we cannot say that the trial court committed "clear error" in finding probable cause that the defendants Aberman and Levett tortiously interfered with the plaintiff's contractual and beneficial relationships. The trial court cited, inter alia, as evidence of the "improper means" exercised by the defendant Aberman, use of her position as acting executive director to harass and to humiliate the plaintiff; her role in preparing and selecting memoranda that would be used as the basis for the plaintiff's discharge; and her role in the dispute involving the plaintiff's salary increase. The trial court attributed to this defendant the "strong motive" that the plaintiff's discharge would and did lead to the retention of Aberman, rather than the plaintiff, in the post of executive director beyond the term her initial contract was to end.

The trial court properly found probable cause to believe that the defendant Aberman tortiously interfered with the plaintiff's contractual relations and her contract with Hall-Brooke. The court found that her actions were taken in bad faith and negligently, that she used her position as executive director "to harass and humiliate the plaintiff by the tone and content of her memos, by her orders to other staff members with

respect to the plaintiff's use of Foundation property and/or records" and that it was "clear that the basis for the plaintiff's discharge were the memos written [by her] and selected by her and given to . . . Levett for compilation and organization." In addition, the trial court also noted Aberman's cancellation of certain executive board meetings, scheduled by Pettitt at the plaintiff's request to work out certain problems. The trial court further noted that Aberman "worked" with Levett by providing him with the material in the summary of conduct and that she failed to provide him with all of the plaintiff's memos during the same period. It was "clear," said the trial court, that Aberman had "a strong motive" for causing the plaintiff's discharge "since she would be, as she in fact became, the Executive Director beyond the term her initial contract was to end with the plaintiff's leave of absence."

The trial court found that there was probable cause to believe that the defendant Levett had tortiously interfered with the plaintiff's contractual relations with the foundation. The trial court believed that he had assisted Aberman in compiling the documents that were presented to the board for its consideration in determining whether to discharge the plaintiff from Hall-Brooke; that he advised the board at the critical meeting of May 22, 1980, not to grant the plaintiff's request for a two-week postponement; and that he failed to provide the board "with information as to alternatives to discharge or as to alternative theories with respect to the plaintiff's employment and contractual rights . . ."; and "[f]rom all that appears, he directed the entire operation, beginning with the meeting in his office on May 14th, and he benefited by the plaintiff's discharge." The trial court concluded that Levett's "motive for engineering the plaintiff's discharge" was the "advantage" he received when Hall-Brooke retained Levett's newly founded law firm as its counsel rather than Cummings & Lockwood.

There is also no "clear error" in the trial court's conclusion that there was probable cause "to believe that the defendant Levett tortiously interfered with the plaintiff's contractual relations with the Foundation for the purpose of benefitting himself . . . ." In that regard, the trial court said of him that "it is clear to the Court, at least for the purposes of this prejudgment remedy hearing, that he pointed the gun which he had loaded with the ammunition furnished by the defendant Ms. Aberman." It also concluded, inter alia, that he "in effect, convinced the Directors that they were within their rights to fire the plaintiff in the manner in which they did and that, in fact, her contracts with the Foundation were probably invalid."[11] The trial court took note of his advice to the directors not to give the plaintiff the requested two week continuance "when he knew she had only two days notice of the charges and a maximum of three days notice of the meeting [of May 22, 1980]." The trial court "viewed" these actions "against the advantage . . . [he] obtained less than nine months after the plaintiff's discharge, a retainer of $5,000.00 a month as counsel for the Foundation as an individual[12] and not as the Cummings & Lockwood firm" in assessing his "motive" in the discharge proceedings. It further commented that there was no evidence that he provided the directors with information as to alternatives to discharge or as to alternative theories concerning the plaintiff's employment and contractual rights. The court was also of the opinion that "he directed the entire operation, beginning with the meeting in his office on May 14th, and he benefited by the plaintiff's discharge."

[11] This statement of the trial court indicates that it examined that exhibit. Levett testified that all copies of the legal memorandum were collected at the conclusion of the meeting of May 22, 1982.

[12] There was evidence in the record that Levett and others from Cummings & Lockwood established their own law firm on January 1, 1981, and that it was this new law firm that had been on retainer by Hall-Brooke Foundation since that time.

It is not appropriate to end our discussion here because the defendants' brief broadly asserts that the trial court's eighteen page decision is wrong on both the law and the facts, that it "overlooked much of the evidence . . . choosing instead to confect an opinion that is self-contradictory, inconsistent, and, in light of the evidence, irrational," and that the result reached is *"totally* without support in the record." (Emphasis added.) Upon review, we find that there are some mistakes in its memorandum of decision, but on the law and all the evidence, the trial court's decision does not at all constitute "clear error." See, e.g., *Three S. Development Co.* v. *Santore,* 193 Conn. 174, 176, 474 A.2d 795 (1984); *William M. Raveis & Associates, Inc.* v. *Kimball,* supra, 333. It is abundantly clear from the transcript that the issue of credibility, a matter for the trial court, was crucial. *New York Annual Conference* v. *Fisher,* 182 Conn. 272, 301, 438 A.2d 62 (1980). We discountenance, as we always have, "wholesale challenges to the findings which result in attempts to have this court retry issues of fact." (Citations omitted.) *Halperin* v. *Pine Plaza Corporation,* 180 Conn. 85, 87, 428 A.2d 340 (1980).

We turn to the "most blatant factual errors" attributed to the trial court. The defendants claim that the court drew "negative inferences based on its affirmative finding that only trustees Frederick T. Jackson and Ramon Nicholl testified" whereas in fact, four members of the trustees—Jackson, Nicholl, Ronald M. Gilbert and Luis J. A. Villalon—testified. The defendants claim, moreover, that the "plaintiff introduced the deposition testimony of trustee Pettit, but the court overlooked this." It is true that the trial court's memorandum stated: "Only Frederick Jackson and Ramon Nicholl testified in this matter." Actually, the trustees Luis Villalon and Ronald Gilbert also testified. Despite the court's statement, we must point out that if, in fact, this statement is taken to suggest that the court did

not consider their testimony, we are not so persuaded. We are entitled to presume that the trial court acted properly and considered all the evidence. See *Avery* v. *Ginsburg,* 92 Conn. 208, 211–12, 102 A. 589 (1917); Maltbie, Conn. App. Proc. § 311. There is, of course, no presumption of error. *Long* v. *Loughlin,* 171 Conn. 291, 292, 370 A.2d 925 (1976). We also note that the defendants never gave the court the opportunity to address this matter by way of a motion for rectification, to explain or correct this impression. See Practice Book § 3082; *Fuessenich* v. *DiNardo,* 195 Conn. 144, 149, 487 A.2d 514 (1985); *Kakadelis* v. *DeFabritis,* 191 Conn. 276, 276 n.1, 464 A.2d 57 (1983). Moreover, a court has an inherent common law power to correct its records but that opportunity was not made available to it. See *Rowe* v. *Smith,* 51 Conn. 266, 275–76 (1883); 20 Am. Jur. 2d, Courts § 56 (1965). In addition, we point out that the defendant's preliminary statement of issues does not indicate that any claim was made that the trial court overlooked the evidence of some of the trustees whom the trial court did not list as testifying. Notwithstanding the court's statement about Jackson and Nicholl, under the circumstances, we are entitled to presume that the court acted properly and considered all the evidence. *Avery* v. *Ginsburg,* supra, 211–12; Maltbie, supra, § 311. Additionally, the record contains not only testimony from Villalon and Gilbert themselves, but also other evidence, both testimonial and documentary, concerning these two trustees. With reference to Pettitt, who was chairman of the board of trustees, the statement that he testified by deposition requires clarification. He was deposed but did not appear and testify; the plaintiff's counsel at the hearing read only parts of that deposition which he claimed were admissions of Pettitt.[13]

[13] The Pettitt deposition was marked as an exhibit for identification only, and the transcript discloses that the deposition itself encompassed at least seventy pages of which only a small portion was read into the record at the prejudgment remedy hearing.

While the trial court was incorrect in stating how many of the trustees in fact testified, its detailed memorandum indicates a survey of all the evidence including some given by the trustees Villalon and Gilbert.[14] Under the circumstances, the erroneous finding in the memorandum of decision had no significant effect upon the result, and, on all the evidence, the trial court did not commit "clear error."

The defendants select certain findings to suggest inconsistency in the trial court's conclusions and also argue that other findings were wholly incorrect and without any support in the evidence; they here thus mounted an attack on the entire memorandum of decision that not only minimizes all the evidence but also overlooks the function of the trier as the judge of credibility together with its right to draw reasonable inferences. "Weighing the evidence and judging the credibility of the witnesses is the function of the trier of fact and this court will not usurp that role." *Gallo* v. *Gallo,* 184 Conn. 36, 38, 440 A.2d 782 (1981); *Johnson* v. *Flammia,* 169 Conn. 491, 497, 363 A.2d 1048 (1975). Our examination of the record in this case commends to us what the United States Supreme Court said recently in explicating Federal Rule of Civil Procedure 52 (a):[15] "When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for

[14] That these statements could apply at least in part to Villalon and Gilbert is evidenced by the record. For example, Villalon said that he had never read the plaintiff's employment contract and that he had never read the August 16, 1979 resolution of the board of trustees authorizing the plaintiff's leave of absence which also permitted her to return as chief executive officer upon the completion of her leave of absence. Gilbert testified that he had *never* read the plaintiff's employment contract, although he was familiar with one or two of its terms, and that he knew she had a lifetime deal.

[15] Fed. R. Civ. Proc., rule 52 (a) provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. See *Wainwright* v. *Witt,* 469 U.S.  , 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson* v. *Bessemer City,* U.S.  , 105 S. Ct. 1504, 1512, 84 L. Ed. 2d 518 (1985).

Given the nature of the attack on the trial court's finding, we have examined the entire record to ascertain whether there is evidence as indicated by the trial court's memorandum of decision, given the standards applicable to sustain the granting of prejudgment remedy relief, to support its conclusion granting that relief.

We have already set out the applicable legal principles which were incumbent upon the trial court and those of our standard of review under our "clear error" standard in these proceedings. In addition, we add, after reviewing evidence before the trier of the fact that the trier is also entitled to draw reasonable inferences based on facts proven. *Duley* v. *Plourde,* 170 Conn. 482, 486–87, 365 A.2d 1148 (1976); *Console* v. *Nickou,* 156 Conn. 268, 275, 240 A.2d 895 (1968); *Hennessey* v. *Hennessey,* 145 Conn. 211, 214–15, 140 A.2d 473 (1958). "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." *Dadio* v. *Dadio,* 123 Conn. 88, 92–93, 192 A. 557 (1937); see *Christie* v. *Eager,* 129 Conn. 62, 64–65, 26 A.2d 352 (1942). "Findings based upon these observations in the court-

room are in the same category as findings based upon a view of premises or property. Such evidence is as properly to be considered by the court in rendering its decision or making its finding as if presented by the lips of witnesses." (Citations omitted.) *Dadio* v. *Dadio, supra,* 93. Under the circumstances, we conclude that it was not clear error for the trial court to grant the prejudgment remedy in this case.

Whatever may be the outcome in a trial on the merits, we need not even speculate, but, for the purpose at least of the prejudgment remedy application, the trial court's decision to order a prejudgment remedy was not in "clear error." This, of course, does not end the inquiry because we must still determine whether the dollar amount of the prejudgment remedy order entered by the trial court was proper.

In passing upon this phase, again we cannot say that there was "clear error" in ordering a prejudgment remedy in the amount of $2,000,000. "As a matter of general experience, a determination of a claim's probable validity normally will entail at least some consideration of the amount of damages which may be found upon a full trial." *Ledgebrook Condominium Assn., Inc.* v. *Lusk Corporation,* 172 Conn. 577, 585, 376 A.2d 60 (1977). There was a profusion of evidence, both testimonial and documentary, before the trial court on this aspect of this matter. Again, the trial court was required to resolve certain conflicts in the evidence.

In 1966, the plaintiff, who was the founder and executive director of Hall-Brooke Foundation, entered into an agreement with Hall-Brooke Foundation, Inc., a nonprofit corporation, for the transfer of the hospital, its license and its leasehold interest[16] to that nonprofit corporation and for her employment as executive direc-

---

[16] The plaintiff is the lessor and receives rentals for the leased premises which encompass the area of about twenty-five acres on which the hospital and school operated by Hall-Brooke Foundation are located in Westport.

tor until she reached age sixty-five[17] or died, whichever occurred first. In 1969, she became a sustaining member of the board to serve until she resigned or became otherwise disqualified. She became treasurer of the foundation in 1969 and was most recently reelected to the office in 1979. Over the years her salary as executive director has risen from $30,000 to $75,000 annually until January, 1980, at about which date she received the questioned increase to $100,000. At the very least, other benefits she enjoyed prior to her discharge have been decreased; these include premiums on a $200,000 life insurance policy, certain automobile expenses and medical benefit plans.[18]

There was evidence from the plaintiff that, prior to her discharge, she had an unsecured line of credit with Union Trust, developed over the years through which she could obtain as much as $350,000 by signing a note.[19] Following her dismissal from Hall-Brooke, the trial court found that her line of credit was terminated. It also found that, after her discharge, she was unable to participate in a multi-million dollar purchase of certain real estate in New York City because this line of credit was terminated, and she could not obtain the credit to participate in contrast to her earlier ability to do so when employed at Hall-Brooke.

The trial court also found that the plaintiff's reputation in this field of hospital administration had been injured. There was evidence acknowledging her reputation in this field. This damage to her reputation can form a basis for compensation by way of damages at

[17] At the time of the prejudgment remedy hearing, the plaintiff was fifty years old.

[18] The plaintiff, who had administered the pension plan before her discharge, estimated that in 1980 the approximate value of her interest in the plan was "over a million."

[19] The plaintiff testified that in one instance "I went up to five hundred thousand dollars unsecure[d]."

a trial on the merits. See Dobbs, Remedies (1973) § 6.4; 22 Am. Jur. 2d, Damages § 93 (1965).

Whether, in a trial on the merits, the plaintiff, if she prevails on the issue of liability, will also prove she is entitled to damages in the amount of the prejudgment remedy is not the issue now before us. The amount of the prejudgment remedy ordered is not in clear error under all the circumstances.

## II

## (Solomon v. Levett)

In this appeal, the plaintiff claims that the trial court, *Cioffi, J.,* erred in dismissing a separate action brought by her against the defendant, David R. Levett. The factual context in this case not only arises from that set forth in *Solomon* v. *Aberman* (No. 12036), supra, but this case is predicated on the alleged relationship of Levett as an attorney with the plaintiff as a client, or more specifically as the client's agent.[20]

This case, *Solomon* v. *Levett,* involves the plaintiff's allegations that the defendant's conduct as an attorney relating to his legal representation of the plaintiff "was unethical and constituted malpractice." As relief, the plaintiff seeks "[j]ust damages" and the "[c]osts and expenses of litigation, including reasonable attorney's fees, based on the defendant's outrageous misconduct." In the count directed against Levett as a defendant in *Solomon* v. *Aberman,* the plaintiff alleged that "[a]s he intended, the defendant Levett's conduct was a substantial factor in causing the termination on May 22, 1980 of the plaintiff's beneficial business relationship with the Hall-Brooke Foundation, Inc., and causing her discharge as a trustee, officer, and

---

[20] The factual allegations of the plaintiff's amended complaint in *Solomon* v. *Levett* include, inter alia, various instances in which the plaintiff claims that the defendant Levett provided legal advice to or otherwise acted as an attorney of the plaintiff.

employee." The plaintiff in *Solomon* v. *Levett* further alleged that "[a]s a result of the defendant Levett's tortuous [sic] conduct, the plaintiff has suffered loss of credit, her professional reputation has been damaged, she has suffered emotional upset, she has been forced to liquidate assets on unfavorable terms, the value of her real estate and her lease have been depreciated, she has suffered loss of income and loss of her principal means of livelihood, and she has expended large sums for attorneys' fees." The plaintiff, in *Solomon* v. *Aberman*, sought, inter alia, "[m]oney damages," "[p]unitive or exemplary damages," and "[s]uch other legal or equitable relief that may be available or appropriate."

Contending that the claims asserted in *Solomon* v. *Levett* were "virtually identical to those in a prior action pending in this court," the defendant moved to dismiss the legal malpractice action against him. The trial court agreed and granted the defendant's motion. In so doing, it stated that the "plaintiff's attempt to characterize the first action as merely a claim for tortious interference, belies the factual allegations pled, which are ultimately grounded in a claim for breach of fiduciary obligation. That breach of fiduciary obligation, under the facts pleaded, is by another name a claim for legal malpractice." We agree with the plaintiff's claim that the trial court erred in granting the motion to dismiss.

In this state, joinder of claims and of remedies is permissive rather than mandatory. See General Statutes § 52-97; Practice Book §§ 133 through 136; cf. Fed. R. Civ. Proc., rule 18. It has long been the rule that when two separate lawsuits are "virtually alike" the second action is amenable to dismissal by the court. *Henry F. Raab Connecticut, Inc.* v. *J. W. Fisher Co.*, 183 Conn. 108, 112, 438 A.2d 834 (1981).

We have consistently reaffirmed this rule: " ' "The pendency of a prior suit of the same character, between the same parties, brought to obtain the same end or object, is, at common law, good cause for abatement. It is so, because there cannot be any reason or necessity for bringing the second, and, therefore, it must be oppressive and vexatious." This is "a rule of justice and equity, generally applicable, and always, where the two suits are virtually alike, and in the same jurisdiction." *Hatch* v. *Spofford,* 22 Conn. 485, 494 [1853]; *Cahill* v. *Cahill,* 76 Conn. 542, 547, 57 Atl. 284 [1904].' *Dettenborn* v. *Hartford-National Bank & Trust Co.,* 121 Conn. 388, 392, 185 A. 82 (1936); see *Zachs* v. *Public Utilities Commission,* 171 Conn. 387, 391–92, 370 A.2d 984 (1976). 'The rule forbidding the second action is not, however, one "of unbending rigor, nor of universal application, nor a principle of absolute law . . . ." *Hatch* v. *Spofford,* [supra].' *Farley-Harvey Co.* v. *Madden,* 105 Conn. 679, 682, 136 A. 586 (1927); see *Brochin* v. *Connecticut Importing Co.,* 137 Conn. 350, 352, 77 A.2d 336 (1950); *Dettenborn* v. *Hartford-National Bank & Trust Co.,* supra, 393." *Henry F. Raab Connecticut, Inc.* v. *J. W. Fisher Co.,* supra, 112–13. We next examine the pleadings to ascertain whether the actions are "virtually alike."

In *Solomon* v. *Aberman,* the claim against the defendant Levett is one of tortious interference with the plaintiff's contractual and beneficial relationships with the Hall-Brooke Foundation. As a matter of law, that claim involves the elements of "tortious interference": the existence of a contractual or beneficial relationship; the defendant's knowledge of that relationship; the intent to interfere with it; and the consequent actual loss suffered by the plaintiff. *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.,* 169 Conn. 407, 415, 363 A.2d 86 (1975). As a matter of fact, that claim in *Solomon* v. *Aberman* involves allegations of

the defendant Levett's complicity and conduct involving the discharge of the plaintiff from her positions with Hall-Brooke.

*Solomon* v. *Levett* presents a different, although at times overlapping, set of circumstances according to the allegations set forth in the plaintiff's complaint. This case involves allegations that the defendant "counseled the plaintiff personally," and in so doing he "in fact developed an attorney-client relationship with the plaintiff relating to [the Hall-Brooke] foundation matters." As a matter of law, the plaintiff must prove that a duty was owed to her as a client by the defendant as her attorney and that the defendant's conduct breached that special duty. See Mallen & Levit, Legal Malpractice (2d Ed. 1981) § 121. As a matter of fact, the plaintiff must adduce evidence to demonstrate that the defendant, in addition to acting as legal counsel for Hall-Brooke, "counseled the plaintiff personally" from 1976 to 1980; that an attorney-client relationship existed between the defendant and the plaintiff; see Mallen & Levit, supra, § 123; and that in this case the defendant's conduct, including adverse representation, breached that special duty. Id., § 127. Unlike the intentional interference claim asserted in *Solomon* v. *Aberman,* the breach of fiduciary duty claim in *Solomon* v. *Levett* may not, depending upon the evidence adduced, require the plaintiff to prove "intent," as the "wrong" occurs simply in the breach. Id., § 124.

We agree with the plaintiff that the focal relationship alleged in the case of *Solomon* v. *Levett* is that of attorney and client. By contrast, the critical relationship alleged in *Solomon* v. *Aberman* exists between the plaintiff and Hall-Brooke; there the allegations sound in conspiracy between Levett and Aberman to interfere with the plaintiff's contractual and beneficial relationship with Hall-Brooke. Because of these various legal and factual distinctions, we find unpersuasive the

defendant's contention that the count against the defendant Levett in *Solomon* v. *Aberman* constitutes a claim for breach of an attorney-client relationship.[21]

The fact that the damages sought by the plaintiff in these two cases may overlap is not dispositive. It is axiomatic that damages recoverable in tort must be proximately caused by a defendant's tortious conduct. See *Johnson* v. *Flammia,* 169 Conn. 491, 499, 363 A.2d 1048 (1975). Accordingly, the defendant Levett, even if he were eventually found liable in both these cases, could conceivably be responsible for *differing* amounts of damages depending upon the plaintiff's ability to prove ultimately the causal relationship between the specific type of tortious conduct at issue in each case and any injury suffered by her. See *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.,* supra, 415; 7 Am. Jur. 2d, Attorneys at Law § 197 (1980). In view of the foregoing, the trial court erred in granting the defendant Levett's motion to dismiss.

There is no error in the case of *Solomon* v. *Aberman.* There is error in the case of *Solomon* v. *Levett,* that judgment is set aside and the case remanded for further proceedings.

In this opinion PARSKEY, SHEA and DANNEHY, Js., concurred.

SATTER, J., dissenting. I dissent only from that portion of the opinion which deals with the case of *Solomon* v. *Levett.* As early as 1850 in *Quinebaug Bank* v. *Tarbox,* 20 Conn. 510, 515 (1850), this court recognized

---

[21] The defendant Levett contends that the following allegation in the plaintiff's complaint in *Solomon* v. *Aberman* supports his position: "36. Despite his fiduciary relation with the plaintiff, the defendant Levett never told her that he and the defendant Aberman were plotting to deprive her of her job and her connection with the hospital or even to warn her that her position at the hospital was in jeopardy." The trial court agreed with the defendant and stated that "an examination of the first complaint [in *Solomon* v. *Aberman*] reveals that the gravamen of her complaint is a claim

the rule as "well settled, that the pendency of a prior suit between the same parties, for the same thing, will abate a latter suit . . . ." Although the rule is evoked by a motion to dismiss, which normally contests the court's jurisdiction; Practice Book §§ 142 through 146; it does not base dismissal on lack of jurisdiction. *Henry F. Raab Connecticut, Inc.* v. *J. W. Fisher Co.*, 183 Conn. 108, 111–12, 438 A.2d 834 (1981). Rather it is recognized as "a rule of justice and equity." *Hatch* v. *Spofford,* 22 Conn. 485, 494 (1853).

This court has varied its formulations of the necessary degree of similarity of the two suits. In *Quinebaug Bank* v. *Tarbox,* supra, the rule is stated as applying to dismiss the second action when both are "for the same thing." Cited with approval in *Zachs* v. *Public Utilities Commission,* 171 Conn. 387, 394, 370 A.2d 984 (1976). In *Hatch* v. *Spofford,* supra, it is invoked when the "prior suit [is] of the same character . . . brought to obtain the same end or object"; id., 494; "the second suit is for the same matter, cause and thing, or the same object is to be attained, as in the first suit . . ."; id., 495; "always where the two suits are virtually alike . . . ." Id., 494. *Welles* v. *Rhodes,* 59 Conn. 498, 503, 22 A. 286 (1890), states that "two suits shall not be brought for the determination of matters in controversy . . . when such determination can be had as effectually and properly in one suit."

The flexibility in formulation reveals that the rule "is not a rule of unbending rigor . . . nor . . . of absolute law." *Hatch* v. *Spofford,* supra, cited with approval

---

for breach of the fiduciary obligations." We disagree. As our above analysis has shown, the complaint against this defendant in *Solomon* v. *Aberman* alleges tortious interference with contractual and beneficial relationships. That claim is recognized as one different in law from the breach of an attorney's obligation to a client. Compare Mallen & Levit, Legal Malpractice (2d Ed. 1981) § 63 with §§ 121 through 127. We note that separate and distinct claims can arise out of the same factual background. See *Keenan* v. *Yale New Haven Hospital,* 167 Conn. 284, 355 A.2d 253 (1974) (negligence and assault in medical malpractice action).

in *Henry F. Raab Connecticut, Inc.* v. *J. W. Fisher Co.,* supra, 113; *Brochin* v. *Connecticut Importing Co.,* 137 Conn. 350, 352, 77 A.2d 336 (1950); *Dettenborn* v. *Hartford-National Bank & Trust Co.,* 121 Conn. 388, 392, 185 A. 82 (1936). Rather, it is designed to achieve one of two objectives. The first is to bar the second suit if it is "oppressive and vexatious." *Hatch* v. *Spofford,* supra, 494. The reason for bringing the later suit is examined. "[A]ll the attending circumstances are to be first carefully considered, and the true question will be, what is the aim of the plaintiff? Is it fair and just, or is it oppressive?" Id. The second objective is to prevent needless duplication of actions. This court noted in *Dettenborn* v. *Hartford-National Bank & Trust Co.,* supra, that there was a growing tendency to invoke the rule "due perhaps to an increased appreciation of the fact that the public has an interest in the prevention of unnecessary litigation, both because of the burden it places on the State and the resulting crowding of the dockets of the courts." Id., 392.

The majority rests its finding of error in the trial court dismissing this action, on the ground that *Solomon* v. *Aberman* sounds in tortious interference, while this action sounds in malpractice. The opinion accurately points out the different element of each claim. Commonality of the two actions, however, far exceeds differences in their legal theories.

In both actions the plaintiff alleges her long standing contractual and beneficial relationship with Hall-Brooke Foundation, as its founder, chief administrative officer, trustee, treasurer and lessor of the hospital building and real property.

In both the plaintiff alleges that the defendant Levett, in conjunction with Aberman, wrongfully acted to terminate the plaintiff's relationship with Hall-Brooke.[1]

---

[1] The complaint in *Solomon* v. *Aberman* alleges:

"34. The defendant Levett then embarked on a program aimed at depriving the plaintiff of her position as a lifetime trustee, Treasurer, and Execu-

In both the plaintiff alleges that the defendant's actions resulted in loss of her employment, damage to her professional reputation and credit standing, depreciation of her lease and real property and incurrence of substantial legal expenses.[2]

In both the plaintiff seeks compensatory and punitive damages.

tive Director and depriving her of her 18 year position as the most influential single person in the affairs of the hospital, all contrary, as he knew, to her contractual and beneficial business relationships with Hall-Brooke . . . .

"36. Despite his fiduciary relation with the plaintiff, the defendant Levett never told her that he and the defendant, Aberman, were plotting to deprive her of her job and her connection with the hospital or even to warn her that her position at the hospital was in jeopardy.

"38. As he intended, the defendant Levett's conduct was a substantial factor in causing the termination on May 22, 1980 of the plaintiff's beneficial business relationship with the Hall-Brooke Foundation, Inc., and causing her discharge as a trustee, officer, and employee."

The complaint in *Solomon* v. *Levett* alleges:

"8. Thereafter in 1980 the defendant Levett, acting in concert with one Rosalie Aberman, violated his duties of loyalty to the plaintiff by actively aiding, abetting and assisting in endeavors: to undermine the confidence of the Board of Trustees in the plaintiff to do away with the plaintiff's position and status at Hall-Brooke; to break her employment contract with the foundation; to have the plaintiff fired for 'insubordination'; to terminate the plaintiff's business relationships with Hall-Brooke Foundation; to cause her discharge as trustee, treasurer, and permanent executive director and permanent chief executive officer and as temporary planning director; and in effect to take over operation of Hall-Brooke Foundation along with said Rosalie Aberman."

[2] The complaint in *Solomon* v. *Aberman* alleges:

"39. As a result of the defendant Levett's tortuous [sic] conduct, the plaintiff has suffered loss of credit, her professional reputation has been damaged, she has suffered emotional upset, she has been forced to liquidate assets on unfavorable terms, the value of her real estate and her lease have been depreciated, she has suffered loss of income and loss of her principal means of livelihood, and she has expended large sums for attorneys' fees."

The complaint in *Solomon* v. *Levett* alleges:

"11. As a result the plaintiff suffered great damage to her professional reputation, to her credit, in the value of her lease and the value of her real estate, to her lease income, to her prospective probable lease income, to the value of her property, and it caused her the loss of her employment and related benefits, all to her great financial loss, and substantial litigation expense."

In *Solomon* v. *Aberman,* the defendant Levett is alleged to be counsel for Hall-Brooke and in this action he is alleged to be counsel for the plaintiff.

The majority opinion finds determinative that, while in *Solomon* v. *Aberman* the critical relationship exists between the plaintiff and Hall-Brooke, in this action the focal relationship is between the defendant and the plaintiff as attorney and client. Whether the tort of the defendant Levett is expressed as interference of contract or as malpractice, however, the central issue in both actions is whether or not his alleged tortious conduct caused termination of the plaintiff's position with Hall-Brooke and caused the losses and injuries for which the plaintiff seeks damages.

By emphasizing legalistic differences between the two claims, the majority opinion ignores that the rule is one of "justice and equity," not one of "unbending rigor."

In viewing the substance of the two actions, it is hard to see them other than "for the same thing"; *Quinebaug Bank* v. *Tarbox,* supra; "of the same character . . . brought to obtain the same end or object"; *Hatch* v. *Spofford,* supra; "virtually alike"; id.; or such that a "determination can be had as effectually and properly in one suit." *Welles* v. *Rhodes,* supra.

Moreover, the plaintiff offers not the slightest reason for instituting this action, particularly when she could easily have alleged its essence by an additional paragraph or two in the *Solomon* v. *Aberman* complaint. When no reason or necessity is advanced, this court can properly regard this second action as "oppressive and vexatious." *Hatch* v. *Spofford,* supra, 494; 1 Stephenson, Conn. Civ. Proc. (2d Ed.) § 104b, p. 423.

Such an inference is further supported by the plaintiff's retaining a different lawyer for each action

against the defendant Levett. There is thus the real prospect that each of the plaintiff's lawyers, in each action, will file separate motions, demand separate interrogatories, and take separate depositions. The complex facts of these cases, revealed in this court's opinion in *Solomon* v. *Aberman,* supra, indicates the potential scope of duplicative discovery. The expenditures of time and money imposed on the defendant is likely to be enormous. Even if trial of the two actions is consolidated, the defendant will be subjected to cross-examination by both of the plaintiff's attorneys and have to resist both of them on issues of admissibility of evidence and in final argument. The rule is designed to prevent precisely such unnecessary expenditure and such harassment.

Finally the majority opinion, by making fine distinctions between the theories of the causes alleged in these two actions, even though both seek the same damages for the plaintiff's same losses, actually encourages multiplicity of suits. Instead, concerned as it is with crowded dockets and litigation delays, this court should apply the rule to preclude such possibilities.

Because the rule is one of justice and equity, which should be liberally construed to achieve its purposes of preventing needlessly harassing and duplicative suits, and because these salutary purposes are achieved by applying it here to dismiss this action, I dissent.