[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On November 19, 2001, maternal aunt and uncle, Mr. and Mrs. C., moved for transfer of guardianship as to the three children, Kayla, Jonathan and Brittany P. On March, 19, 2002, the court entered orders terminating the parental rights of the biological mother of all three children and the biological father of Brittany. The putative father of Kayla and Jonathan is deceased. The attorney for the children filed a motion on January 24, 2002 to reopen the permanency plan with regard to the children. Testimony on the motion for transfer of guardianship began January 24, 2002 and continued thereafter over a number of days, concluding on September 12, 2002.[1] The court consolidated the hearing on the motion for transfer of guardianship with the children's motion to reopen the permanency plan. The court heard from many witnesses, including Dr. David Mantell, Dr. Kelly Rogers, the children's therapists, two foster mothers, DCF workers and a supervisor, a physician for Mr. and Mrs. C., and the guardian ad item for the children. Additionally, both Mr. and Mrs. C. testified concerning their request for transfer of guardianship. The court has also reviewed all of the documentary evidence in the case.
Based on the court's careful review and consideration of all the testimony and evidence, the court hereby denies the motion to transfer guardianship to maternal aunt and uncle. The evidence established that the C.'s have consistently maintained a strong desire to provide a home for Kayla and Brittany and have secured a home that would be large enough for the children to live with them. They also completed parenting classes and became licensed by DCF as a relative foster placement. The C.'s are the only relatives with whom the children have any connection and the court finds that they have clearly demonstrated their love and commitment to these children.
Despite their commitment to the children, however, in this case, the court finds that the testimony and the evidence clearly established that the C's are simply not in a position to care for these children who, as CT Page 12694 shown by the evidence, have substantial special needs.
These three children were subjected to severe abuse and neglect by their biological parents and guardians. Both Kayla and Brittany have attachment issues, are on medication for ADHD and require continued therapy. Although Kayla, now 10, does very well in reading, she has academic needs in math, and it appears that Brittany, now 7 who is also diagnosed with Oppositional Defiant Disorder, ODD, will have even greater special needs with regard to her education. Jonathan, age 8, exhibits behaviors consistent with ODD, and ADHD and suffers from severe psychological issues as a result of the physical and sexual abuse and neglect he was subjected to long-term. As a result, Jonathan is placed in a professional foster home. According to the testimony of Ms. B., foster mother of Kayla and Brittany, both girls require constant supervision.
Most importantly in the court's view, both Dr. Mantell and Dr. Rogers recommended against placing the children with the C.'s. The court places great weight on the testimony of these expert witnesses. "The psychological testimony from professionals is rightly accorded great weight . . . [in termination proceedings.]" (Internal quotation marks and citation omitted.) In re John G., 56 Conn. App. 12, 24, 740 A.2d 496
(1999). Both psychologists, as well as a physician for Mrs. C., identified significant limitations of Mrs. C. including comprehension and intellectual limitations. Dr. Rogers found that Mrs. C.'s intellectual functioning was limited and that she functioned at a borderline level. He also found that Mr. C. suffered from schizo-affective thought disorder. Dr. Rogers concluded that because both Mr. and Mrs. C. had limited tolerance for stress, they would not be able to meet the children's strong special needs or respond to them on a long term basis.
Dr. Mantell concluded in his updated evaluation that although he had initially recommended a possible trial placement with the C.'s because they were the only family Kayla and Brittany had, the data from the updated evaluation did not support a trial placement with the C.s. He did conclude that the children derive benefit from their contact with Mr. and Mrs. C. and that visitation should continue.
Mrs. C., now 28, left her home at age 15 and has lived with Mr. C. since she was 16. She herself was a victim of sexual abuse as a child and has been on social security disability since 1993. Mrs. C. has no children. She does not work outside the home, but she does drive and is able to cook, clean and do laundry. Although Mr. C. indicated that he thought Mrs. C. was capable of raising the children, at least with outside help, he also questioned her abilities at times and was strongly ambivalent about having the children returned to his home. As Mr. C. CT Page 12695 candidly stated in the course of the updated evaluation by Dr. Mantell, he did not think it would be in the children's best interest to live with him and Mrs. C. and he would be satisfied with visitation. He stated that a man his age, 66, is usually retired. He has been a father and a grandfather and has had two families. He has had 12 children. He continues to take Stelazine for depression and takes medications for emphysema. Although he remained supportive of his wife's desire to have the children live with them, his statements reflect a realistic understanding of what would be required to raise these children with severe specialized needs, as well as his wife's limitations, and that he would prefer not to take on that responsibility at this time. He indicated to Dr. Mantell that he had tried to talk Mrs. C. out of her quest for custody. Both Mr. and Mrs. C. acknowledge the excellent quality of care that the children are receiving in their foster homes.
The court believes that the C.'s have the children's best interests at heart and that they have consistently demonstrated their concern for the children. Nonetheless, the court had an opportunity to observe and consider both Mr. and Mrs. C.'s abilities as they testified during the course of the hearing. "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Solomon v. Aberman, 196 Conn. 359, 379, 493 A.2d 1933, (1985),Dadio v. Dadio, 123 Conn. 88, 92-93, 192 A. 557 (1937); see Christie v.Eager, 129 Conn. 62, 64-65, 26 A.2d 352 (1942). The Dadio court stated that:
 Findings based upon these observations in the courtroom are in the same category as findings based upon a view of premises or property. Such evidence is as properly to be considered by the court in rendering its decision or making its finding as if presented by the lips of witnesses. Dadio v. Dadio, 123 Conn. at 93.
From that evidence, the court concludes, as did both psychological evaluators, that Mrs. C.'s limitations would prevent her from being able to meet effectively Kayla, Brittany, and Jonathan's specialized needs and would affect her ability to respond to their needs on a full time long-term basis.
The court commends the C.'s on the efforts they have made to attempt to obtain guardianship. However, due to Mrs. C.'s limitations as set forth fully by Drs. Mantell and Rogers in their testimony and in their written reports, and in view of Mr. C.'s serious health concerns and other concerns expressed by Drs. Rogers and Mantell, it is the court's CT Page 12696 determination that the C.'s are not in a position to care for these specialized needs children on a daily basis. The court finds that it would not be in the best interest of Kayla, Brittany, and Jonathan to have guardianship transferred to the C's. Thus decision is fully supported by the updated evaluations of both Dr. Rogers and Dr. Mantell. Thus, the motion for transfer of guardianship to the C.'s is denied.
Review of Permanency Plan
The permanency plan for the three children as approved August 30, 2001 (Mack, J.) provided for adoption of all three children. Both the children's attorney and their guardian ad item urge the court, in reviewing that plan, to provide that the children shall be placed in long-term foster care with the current foster parents, instead of adoption. The Department of Children and Families urges the court to approve a plan of adoption to provide these children with a permanent family and the evidence established that there are families which have been identified as possible pre-adoptive homes.
Although under many circumstances, adoption is a more ideal goal, under the circumstances of this case, the court finds that the clear and convincing evidence established that at this time the plan for these children (for whom parental rights have been terminated) should be for long-term foster care with the identified foster parents. The court again relies upon the testimony of Dr.'s Mantell and Rogers that the removal of the children from these homes where they have finally found stability would be detrimental to them. As Dr. Mantell's report compellingly stated, "it is unlikely that [Kayla and Brittany] could leave [Ms. B.'s] home without suffering severe and disabling removal trauma." May 14, 2002 Report at 21.
As to Jonathan, his foster mother has made significant progress under very difficult circumstances. His destructive behaviors as well as his enuresis and encopresis require an extraordinary level of care which is currently being provided by his professional foster parent. He has bonded well with his foster mother such that she is one of the few people able to manage his conduct and he has even made some progress while in her care. Disruption from his foster home could cause decompensation and residential placement.
With regard to Kayla and Brittany, their attachment issues as discussed by Dr. Mantell and their traumatic history suggests that the stability and consistency they have in their foster mother's home is crucial. Although the foster mother indicated that she does not plan to seek adoption, and indeed, she recently adopted another child in her home, the CT Page 12697 court credits her testimony that she continues to be committed to the children and is willing to keep them in her care. The court notes that the foster mother has been very supportive of visitation with the maternal aunt and uncle and has been successfully supervising visitation. In view of the attachment problems these girls have experienced, and their need for consistency and stability, the possibility of a successful placement with a pre-adoptive family does not outweigh the substantial risk involved in removing these children from the safe and secure environment they have known for the past three years.
Although Kayla has stated that she would prefer to live with her aunt and uncle, the court finds, consistent with the ruling on the motion for transfer of guardianship, that that is not in her best interest. Kayla has stated that if she cannot live with her aunt and uncle, she would like to continue to live with her foster mother, Ms. B. Dr. Mantell's updated evaluation found that although Kayla has "strong affection for her aunt and uncle and feels connected to them by family ties [, h]er sense of family psychologically is now firmly established with the foster family." May 14, 2002 Report at 5. Brittany has expressed her desire to live with Ms. B., foster mother, "forever." In recommending continued placement of Kayla and Brittany with their foster mother, Dr. Mantell stated:
 She has become the sustaining parent figure for both children. She is the primary person of their respective identifications and attachments. They derive their sense of security, emotional sustenance, family identity and interpersonal trust from their relationship with the foster mother. May 14, 2002 Report at 20.
For the reasons set forth above, the court approves of placement of the children in long-term foster care with the identified foster parents. The court finds that the testimony established compelling reasons why it is not in the best interests of these children for the plan to include the goals set out in (A)- (D) of P.A. 01-142 Sec. 7 (k) (3). The court relies on the testimony and reports of Drs. Mantell and Rogers and the testimony of Kayla's current therapist, Ms. Maven, who credibly testified that Kayla would experience a major loss if she were removed from Ms. B.'s home, and could lose the progress that she has made. The therapist, as well as the psychologists who conducted the evaluations in this case, all found Kayla and Brittany to be extremely strongly bonded with their foster mother, Ms. B., and with the other children living in the foster home. Indeed, as Ms. Brinker testified, other than DCF, there was no support for removing the children from their current homes. CT Page 12698
Thus, for all the reasons set forth above, the court approves a plan for a terminated child that provides for long-term foster care in the identified foster homes as to each of the three children.
So ordered this 8th day of October, 2002.
Jongbloed, J.