[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION APPLICATION FOR PREJUDGMENT REMEDY DATED SEPTEMBER 28, 1990
HISTORY OF THE PROCEEDINGS
Burritt Interfinancial Bancorporation ("Burritt") on September 28, 1990 filed this Application for Prejudgement Remedy ("Application") with an accompanying unsigned writ, summons and complaint in the Judicial District of Litchfield. The matter was transferred October 22, 1990 to the Judicial District of Waterbury.
This statutory proceeding for real estate attachments arises out of monies loaned by Burritt to the defendant-Genvest, a fifteen-member partnership. Burritt's twenty-five count complaint seeks the balance of the monies due under the loan not only from Genvest, but also from the partners, based upon certain guarantees made by each of them to Burritt, and finally, Burritt complains that certain of the partners have made fraudulent real estate transfers and it seeks, in this proceeding, to attach that realty.
Evidentiary hearings on the Application were held November 19, 26 and December 3, 1990. During these proceedings, Burritt introduced numerous documentary-type exhibits and offered the testimony of Robert Pawloski, a Senior Vice-President and Senior Loan Officer of Burritt. Pawloski was the sole witness offered by any of the parties and in the course of his testimony identified another bank officer, Robert J. Kasper, as the person who was responsible for the actual management of the loan to Genvest. In CT Page 2192 addition to the exhibits offered by Burritt, the defendant Carey R. Geghan offered eight documentary exhibits. At the conclusion of these evidentiary hearings, the parties were ordered to file briefs and Burritt was ordered to file proposed findings of fact and conclusions as to each defendant concerning whom it sought PJR attachment relief.
On December 18, 1990, Burritt filed a Notice of Bankruptcy in which it stated that it had instituted an involuntary bankruptcy petition under Chapter 7 of the United States Bankruptcy Code against the following defendants: Carey R. Geghan, Francis X. Campion, Mary Tynan and Harold Kay. In its notice, Burritt suggested that these PJR proceedings were stayed based on federal bankruptcy law only as to Geghan, Campion, Mary Tynan and Harold Kay.
In response to Burritt's actions in bankruptcy against four of these defendants, letters and motions originated from the defendants, all of which were docketed for a December 31, 1990 hearing. At that proceeding, the bankruptcy-imposed-stays against Carey R. Geghan, Francis X. Campion, Mary Tynan and Harold Kay were noted by this court. Additionally, Burritt did not oppose stays against Brian Tynan, William Tynan and Richard C. Tynan. Accordingly, we stayed, until further order, these proceedings against them.
In response to our briefing orders, Burritt has filed proposed findings of fact and conclusions affecting three of the defendant-Genvest partners, Louis DiCostanzo, Antonio Petta and Michael Vernovai and the three defendants to whom they allegedly transferred real estate in fraud; namely, Mildred R. DiCostanzo, Antonia Petta and Lorina P. Vernovai. Thus, the pending Application for PJR-type real estate attachments is limited to the defendants-DiCostanzo; defendants-Petta, and defendants-Vernovai.
ARCHITECTURE OF THE COMPLAINT
In count one of the September 28, 1990 unsigned complaint, filed with this Application, Burritt alleges that it agreed on November 3, 1988 to loan to the Genvest partnership $2,000,000.00 pursuant to the terms of a revolving commercial Grid Demand Note ("Grid Demand Note"); that there is presently due a balance under the note of $943,763.09; that Genvest is in default according to the terms of that note; and that the bank seeks collection of the unpaid balance plus costs.
In count fourteen, Burritt alleges that Louis D. DiCostanzo, a Genvest partner, on or about November 7, 1988 executed a personal Guaranty Agreement with Burritt to pay the Genvest loan and in this count, Burritt, based on that personal guarantee seeks CT Page 2193 collection of the balance of the loan plus costs allowed. Similarly in count sixteen, based on a guarantee agreement signed November 9, 1988, Burritt seeks collection against Michael Vernovai, Sr.; and in count twenty-two Burritt, also based on a personal guarantee signed November 7, 1988, seeks collection of the loan balance against Antonio Petta.
In counts fifteen, seventeen and twenty-three of the complaint, Burritt sets forth its claims in fraudulent transfer of real property against the Genvest partners and personal guarantors, DiCostanzo, Vernovai and Petta, and the allegedly fraudulent transferees of the real estate parcels in question: Mildred R. DiCostanzo, Lorina P. Vernovai, and Antonia Petta.
In paragraph thirteen of count fifteen, Burritt alleges that on or about February 14, 1990, Louis DiCostanzo "for the consideration of love and affection transferred property located at 93 Meriden Road, Waterbury, Connecticut to Mildred R. DiCostanzo of Middlebury, Connecticut." Burritt, in this count, goes on to claim in paragraph fourteen that this conveyance was fraudulent because it was made without substantial consideration and "rendered DiCostanzo unable to pay his existing debts or it was made with fraudulent intent in which Mildred R. DiCostanzo participated."
The claim in fraudulent conveyance against Michael J. Vernovai, Sr. and Lorina P. Vernovai is framed similarly to the one against the DiCostanzos. Particularly, in count seventeen, Burritt alleges on or about August 23, 1990 "Vernovai, for no consideration transferred property located at 71 Dalton Street, Watertown. . . to Lorina P. Vernovai of Watertown. . . ." Burritt claims this to be a fraudulent conveyance. Finally, the claim in fraudulent conveyance against Antonio Petta and Antonia Petta is set forth in count twenty-three and there, Burritt claims that on or about August 15, 1990, Petta "for consideration paid (no conveyance tax collected) transferred property at 75 Wellington Avenue, Waterbury, Connecticut to Antonia Petta a/k/a Antoinetta Petta a/k/a Antonietta Petta of Waterbury, Connecticut." Burritt also claims this to have been done in fraud of its creditor position.
APPLICABLE LEGAL PRINCIPLES
At the conclusion of this evidentiary hearing, it is our duty to determine in this statutory proceeding whether there is probable cause to sustain the validity of the plaintiff's claims in fraudulent transfer and if so, to order the issuance of the three PJR-real estate attachments. Conn. Gen. Stat. Section52-278d; McCahill v. Town Country Assoc. Ltd., 185 Conn. 37, 39
(1981); Self-Service Sales Corp. v. Heinz, 1 Conn. App. 188, 194
CT Page 2194 (1984). In reviewing this pretrial application, we must determine not whether the plaintiff will prevail at trial, but only whether there is probable cause to uphold the validity of its claims. Solomon v. Aberman, 196 Conn. 359, 363 (1985); Three S. Development Co. v. Sandere, 193 Conn. 174, 175 (1984); Michael Papa Associates v. Julian, 178 Conn. 446, 447 (1978). Thus, we deal here only in probabilities.
Each of the three prejudgment remedies sought by this Application is a real estate attachment bottomed upon an allegedly fraudulent conveyance.
 "A fraudulent conveyance for the purpose of attachment is one made without substantial consideration and which renders the debtor unable to meet his obligation or one made with fraudulent intent in which the grantee participated. Town Bank Trust Co. v. Benson, 176 Conn. 304, 307. . . (1978). Dennis Development Co. v. Gunther, 189 Conn. 333, 335. . ., (1983)." Sweet v. Sumnerbrook Mill Development Corp, 21 Conn. App. 191, 195 (1990).
Thus, the burden is on Burritt to prove that each of the three Genvest partners (DiCostanzo, Vernovai and Petta) conveyed for less than a valuable consideration and was thereby unable to pay his alleged debts or that the conveyance in question was made with fraudulent intent in which each of the three transferees participated.
 FINDINGS APPLICABLE TO LOUIS DICOSTANZO, MICHAEL VERNOVAI AND ANTONIO PETTA
From the credible evidence presented by Burritt, the court makes the following findings as to DiCostanzo, Vernovai and Antonio Petta:
1. By a commercial revolving Grid Demand Note dated November 3, 1988, Genvest promised to pay to Burritt the principal sum of $2,000,000.00 or the "aggregate unpaid principal amount of all advances. . . ." Exhibit A. The Grid Demand Note was executed in behalf of Genvest by one of its partners, John A. Corpaci.
2. A borrowing resolution dated November 3, 1988 signed by Genvest partners, Corpaci and Duncan, facially indicates that they were authorized to borrow money and obtain credit from Burritt in behalf of Genvest until Burritt received a written revocation of this authority. Exhibit C. No such revocation was ever received CT Page 2195 by Burritt.
3. Each of the Genvest partners executed a Partnership Authorization during November of 1988 in connection with the $2,000,000.00 line and in this document Corpaci or Duncan was authorized by the partners to sign the necessary documents "and to do whatever things may be necessary to consummate the above mentioned line of credit, purchase and mortgages." Exhibit B.
4. Antonio Petta (Plaintiff's Exhibit D1), Louis DiCostanzo (Plaintiff's Exhibit D6) and Michael Vernovai, Sr. (Plaintiff's Exhibit D7) during early November of 1988 each executed a written guaranty agreement for the benefit of Burritt in which each of these three Genvest partners personally obligated themselves to perform on any default or agreement that Genvest might have with Burritt.
5. The Grid Demand Note's maturity date was modified on June 6, 1990 from November 3, 1989 to November 3, 1991. The modifying document was signed by John A. Corpaci. Geghan Exhibit 2.
6. Monies were advanced to Genvest under the Grid Demand Note as indicated in Schedule 1 of Exhibit A. The last advance was made by Burritt on May 23, 1990 in the amount of $250,000.00 and on that date, the principal balance remaining unpaid on the Grid Demand Note was $1,125,000.00. Exhibit A, Schedule 1.
7. Genvest defaulted on the Grid Demand Note August 1, 1990, when it failed to make an interest payment. By the middle of August, 1990, Corpaci indicated to Burritt that no further interest payments would be made by Genvest under the Grid Demand Note. See: Hearing of December 31, 1990, Transcript at 83-89; Exhibits M and X. Burritt then set off Genvest's pledged certificate of deposit against the Grid Demand Note and credited the account with a payment of $215,645.98. This left a principal balance remaining unpaid as of August 20, 1990 of $909,354.02. Exhibit A, Schedule 1.
8. Under date of September 11, 1990, Burritt wrote Genvest demanding payment of its obligations. Exhibit N.
9. Burritt from the outset of this loan activity with Genvest and its partners knew that although each had made a personal guarantee of the whole Genvest debt, not each partner had a financial estate capable of repaying the whole line of credit and was "hypothetically" insolvent. Thus Burritt looked to all of the partners collectively. Hearing of November 26, 1990, Transcript at 132-33; Hearing of December 3, 1991, Transcript at 49-54. CT Page 2196
 FURTHER FINDINGS OF FACT APPLICABLE TO DEFENDANT LOUIS DICOSTANZO AND MILDRED R. DICOSTANZO (COUNT FIFTEEN)
10. On February 14, 1990, Louis C. DiCostanzo conveyed to the defendant, Mildred R. DiCostanzo, his one-half interest in real property located at 93 Meriden Road, Waterbury, Connecticut by quit claim deed recorded in the Waterbury Land Records on February 15, 1990. This conveyance was made "especially for love and affection." Exhibit R. In his financial statement dated September, 1989, DiCostanzo reported his net worth to be $2,605,006.00 and the real estate conveyed on February 14, 1990 was in that document specified to have a market value of $1,000,000.00 and to be jointly owned. Exhibit J. During 1987, Burritt reported DiCostanzo's net worth to be $1,934,064.00 with a real estate equity position of $1,161,727.00. Geghan Exhibit 3. At the time of the February, 1990, transfer by DiCostanzo, the impact of this conveyance upon DiCostanzo's financial estate and his ability at that time to pay his debts was unknown. Hearing of December 3, 1991, Transcript at 33-38.
 FINDINGS OF FACT APPLICABLE TO MICHAEL VERNOVAI, SR. AND LORINA P. VERNOVAI (COUNT SEVENTEEN)
11. On August 23, 1990, Michael Vernovai, Sr., a Genvest general partner, quit claimed his residential real estate on Walton Street, Watertown, Connecticut to the defendant Lorina P. Vernovai for "no consideration." Exhibit Q. In his financial statement dated September 19, 1988, Vernovai reported a net worth to be $786,883.00 and also reported that this real estate at that time was jointly owned and had a market value of $150,000.00. Exhibit K. During October 1988, Burritt reported Vernovai's net worth to be $718,833.00. Geghan Exhibit 3. The impact of this conveyance upon Vernovai's finances and his ability to pay his debts at that time was unknown. Hearing of December 3, 1990, Transcript at 49-54.
 FINDINGS OF FACT APPLICABLE TO ANTONIO PETTA AND ANTONIA PETTA (COUNT TWENTY-THREE)
12. On August 22, 1990 Antonio Petta, a Genvest partner, quit claimed "for consideration paid" properties located on Highland Avenue, Wellington Avenue, and Glenford Drive, Waterbury to Antonia Petta. Exhibit P. In a financial statement dated September, 1989, Petta reported a net worth of $2,898,520.00 and also therein generally described his real estate holdings. Exhibit I. Earlier, Burritt reported Petta in 1966 had a net worth of $1,645,812.00. Geghan Exhibit 3. There is no congruency of description between CT Page 2197 Exhibits P and I for the questionable realty transfers and no monetary values are reported. At the time of this August 22, 1990 conveyance, the impact of it upon Antonio Petta's financial estate and his ability to pay his debts as they matured was unknown. Hearing of December 3, 1990, Transcript at 27-30.
CONCLUSIONS
We conclude, at the outset, that there is no credible evidence which persuades us to hold that the allegedly fraudulent transferees named in counts fifteen, seventeen and twenty-three; namely, Mildred R. DiCostanzo, Lorina P. Vernovai, and Antonia Petta participated in any fraudulent intentional activity with their named transferors.
This evidentiary record reveals that Burritt was looking to the Genvest partners, DiCostanzo, Vernovai and Petta, not only individually on their written guarantees, but also collectively, since Burritt knew from the outset of the Grid Demand Note activity that no one of these three individuals had a personal financial estate sufficient to cover a $2,000,000.00 Genvest default. Significantly to us, DiCostanzo, Vernovai and Petta were each, to use a Burritt description, "hypothetically" insolvent.
At the time the three real estate transfers in question were made, we do not know from this record the status of the financial estates of the Genvest partners DiCostanzo, Vernovai, and Petta. Interestingly to us, in this regard, are the financial profiles of DiCostanzo and Petta, which tend to reveal two gentlemen with some investment skill and appreciating estates. Thus, we do not know, nor will we conclude on this limited record that any one of them, relative to their personal commitments initially made to Burritt, was unable to pay their debts, after the questioned realty transfers. — This situation is aggravated in the case of DiCostanzo because his transfer occurred several months before the Genvest default and also in the case of Petta because we are unable to determine on this record what affect his one transfer had upon his resultant ability at the time of that transfer to pay his debts as they matured. See Patrocinio v. Yalanis, 4 Conn. App. 33
(1985).
In conclusion, the evidentiary record presents us with a scenario of nugatory financial circumstances involving Burritt and the Genvest partners, but the evidence we deem credible does not persuade us to conclude that there is the requisite probable cause to sustain the validity of the claims set forth in counts fifteen, seventeen and twenty-three of the complaint. Accordingly, the Application for Prejudgment Remedy as to those three counts is denied.
WILLIAM PATRICK MURRAY, J. CT Page 2198