[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
About April 25, 1973, the plaintiff, Hartford Provision Company, as subtenant, through its predecessor in interest, Gran Central Markets #3, entered into a commercial Sublease with the defendant, First National Supermarkets, Inc., as sublessor, through its predecessor in interest, First National Stores, Inc. (hereinafter "Sublease"). For several years under the sublease, the plaintiff operated a supermarket on the premises until closing it due to business conditions.
This is an action for breach of contract in which the CT Page 10361 plaintiff asserts that the defendant acted in breach of a covenant of good faith and fair dealing in refusing its subtenant's wish to transfer its lease and terminating the existing Sublease. There is also a counterclaim for tax, maintenance and lighting payments due the defendant under the Sublease.
The court holds: (1) the duty of good faith and fair dealing applies even to subleases providing that if the subtenant wishes to transfer, the landlord may refuse to consent, elect to recover possession, and release the subtenant from further lease obligations; (2) the defendant's refusal to consent here did not breach an implied covenant of good faith and fair dealing because the defendant did not act out of improper motives but in its own economic interest which the agreement of the parties contemplated; (3) the defendant is entitled to judgment in the amount of $31,009.72 on its counterclaim for payments due it under the Sublease for taxes, common area maintenance and lighting which it was required to pay to the owner of the premises under its Sublease.
The Sublease was subject to a certain master lease dated May 1, 1958, between the defendant, as tenant, and The Jed Company and The Marcardon Company, as landlords, and covered certain premises located at Governor Street and Bailey Avenue, Ridgefield, Connecticut, from which premises both the plaintiff and the defendant at different times operated supermarkets.
Paragraph 10 of the Sublease reads in pertinent part as follows:
 10. Assignment, Etc., of Lease. Tenant shall not further assign mortgage, sublet or otherwise transfer all or any part of its interest in this Sublease or its right to occupy said premises as aforesaid, whether voluntarily or involuntarily, without the prior written consent of Landlord, provided, however, that Tenant shall have the right to assign this Lease to a wholly owned subsidiary of Tenant. In the event of any permitted assignment or sublease, Tenant shall nonetheless remain fully liable hereunder and shall not be released from performing any of the terms, covenants and conditions of this Sublease or of the Prime Lease. In the event Tenant elects to assign or sublet the premises to other than a subsidiary of Tenant, it shall give written notice CT Page 10362 to Landlord of such intention which notice shall set forth the name and address of the proposed subtenant or assignee and the terms of such proposed assignment or sublease. Landlord shall notify Tenant within fifteen (15) days after receipt of such notice as to whether or not it will consent to such assignment of sublease and in the event Landlord does not consent to such assignment or sublease, then this Sublease shall terminate on the last day of the calendar month after Landlord so notifies the Tenant of its refusal to consent to such assignment or sublease. The failure of the Landlord to send any notice to Tenant within said fifteen (15) day period shall be deemed to be a consent to said assignment or sublease. It is specifically understood that Tenant shall have no right to assign or sublet the premises for a term extending beyond the term in which the assignment or subletting occurs and that no assignee or sublessee shall have the right to exercise any options to extend the term of this Sublease that may be granted to Tenant hereunder.
In 1986, the parties entered into a sublease modification agreement where defendant, First National, sold the plaintiff three additional five year options, giving the plaintiff the right to extend the sublease to April 30, 2004. Only the first such option extending through April 30, 1994 was ever exercised.
The parties are at issue over the defendant's exercise of a lease right permitting it to terminate the lease and recapture the leasehold upon the receipt of notice from its subtenant of intent to sublet or assign.
The defendant, First National, has also counterclaimed against the plaintiff which was its subtenant for payment of various charges due under the lease to the owner lessor of the premises. The defendant claims that pursuant to paragraph 6 of the sublease and provisions of the underlying prime lease, the plaintiff owes it (1) for the payment of such real property taxes in the amount of $26,889.72 consisting of $3,447.72 on the list of October 1, 1986, $10,810.66 on the list of October 1, 1987, and $12,631.34 on the list of October 1, 1988; (2) for maintenance and lighting of the parking area on the anniversary date of the prime lease $1,105.00; and (3) for the payment of such maintenance and lighting charges in the amount of $3,015.00 CT Page 10363 for the lease years commencing on May 1, 1987, May 1, 1988, and May 1, 1989, payable respectively on May 1, 1988, May 1, 1989, and May 1, 1990.
Turning first to the counterclaim, the court finds its allegations proved, finds the issues for the defendant counter-claimant, and that the defendant was entitled to payment of these sums from the plaintiff. Accordingly, judgment is to enter in favor of the defendant counter-claimant and against the plaintiffs on the counterclaim in the amount of $31,009.72. The claim for interest is disallowed. Matters were sufficiently in dispute here that award of prejudgment interest is not warranted.
The court will now turn its attention to the plaintiff's complaint and the principal issues in this case. A tenant's right to assign a lease is often covered in the lease language itself. Prior to the holding in Warner v. Konover, 210 Conn. 150,553 A.2d 1138 (1989), the language contained in a typical lease agreement often granted to the lessor: (1) the right to refuse to consent to a sublet, or (2) provided for a landlord's right to approve a subtenant, which approval would not be unreasonably withheld. Where a lessor or sublessor had the right to refuse assent but did not incorporate a lease obligation not to unreasonably withhold approval, then it was formerly generally understood to be in the lessor's discretion to refuse assent to a sublease. Much of the commercial certainty which had previously existed concerning assignment or subleases between parties to commercial lease agreements vanished with the holding in Warner v. Konover, supra. Warner adopted the minority position of courts nationwide in holding that an implied covenant of good faith and fair dealing imposed on parties to all contracts also applied to lease contracts where the language of the lease agreement gave the power to one party to a lease agreement to refuse consent to an assignment or a sublet, and standards for the refusal were not set out in the lease agreement.
In Warner v. Konover, supra, 154-155, the Connecticut Supreme Court held that "a landlord who contractually retains the discretion to withhold its consent to the assignment of a tenant's lease must exercise that discretion in a manner consistent with good faith and fair dealing." In Warner, the landlord Konover refused to assent to a new subtenant unless more money was paid to it. The lease provided "Tenant will not assign this Lease in whole or in part, nor sublet all or any CT Page 10364 part of the Leased Premises, without the prior written consent of Landlord . . ." The lease contained no requirement that the consent would not be unreasonably withheld. See Warner v.Konover, supra, 152 n. 1 Konover apparently left the tenant bound to pay rent upon the premises even if approval of a sublet was denied. See: Note 1 at 152 Konover supra.
In the present case, if the assignment or sublet is disapproved, the lease must be terminated by the landlord and the tenant is thereby absolved of future lease obligations. The defendant in this case contends that the presence of such a recapture and release clause in the lease distinguishes it fromKonover. The defendant further asserts that it had good business reasons for terminating the sublease but that the lease contract gave it the right to terminate the sublease for any reason or for no reason, so long as it released the subtenant from any further sublease liability. The plaintiff in this case contends, however, that such a release does little for it. It urges that although it had closed its store, its lease right was a valuable real estate asset and that it had paid additional consideration to the landlord to purchase three additional rights to exercise renewal options for a total of an additional fifteen years through the year 2004 at below market rates. It claims losses extending out to the year 2004 because of the refusal of defendant to agree to permit it to sublease or assign. At first blush, this plaintiff's argument has its attraction. However, when one reads the sublease between Hartford Provision and First National Supermarkets, Inc., the last sentence of paragraph 10 of it is most instructive. It provides that, "It is specifically understood that Tenant shall have no right to assign or sublet the premises for a term extending beyond the term in which the assignment or subletting occurs and that no assignee or sublessee shall have the right to exercise any options to extend the term of this Sublease that may be granted to the Tenant hereunder." The subsequent agreement granting the plaintiff these additional options left these options subject to this and other sublease terms. No renewal options had been exercised beyond the current term. There was a renewal in effect at the time of the request for approval of assignment but the term of that renewal ended on April 30, 1994. According to the sublease, therefore, the tenant could not expect to assign or sublease for any lengthy period of time extending to the year 2004.
The plaintiff asserts that in determining the good faith of CT Page 10365 the lease termination, the court should look to a standard of commercial reasonableness. It suggests that factors to be considered include financial responsibility of the proposed assignee, suitability and legality of the proposed use of the particular property, need for alteration, and similarity to prior use. There is no dispute factually that Hartford Provision Company had been a good tenant, that it would still be bound, that Hay Day Markets, its proposed sublessee, was a known company also engaged in the retail food business, a use for which the premises had always been utilized. These factors constituting "commercial reasonableness" dovetail with the 1985 statement of the minority view of courts in the United States found in the California case of Kendall v. Ernest Pestana, Inc.,709 P.2d 837, 845 (1985). Kendall elucidates a rationale for the adoption of the minority view of U.S. courts on alienability in describing why denials of consent by an owner on the basis of personal taste, convenience, sensibility, desire for higher rent are not legally sufficient reasons. The Kendall court limited:
 permissible purposes of the restraint on alienation — to protect the lessor's interest in the preservation of the property and the performance of the lease covenants. `[T]he clause is for the protection of the landlord in its ownership and operation of the particular property — not for its general economic protection.' (Ringwood Associates v. Jack's of Route 23, Inc., supra, 379 A.2d at p. 512, quoting Kreiger v. Helmsley-Spear, Inc., (1973) 62 N.J. 423, 302 A.2d 129, italics added.)
Kendall, supra, 845.
Such a rationale limps where the party refusing consent to transfer and exercising a right to terminate a lease is itself a tenant, not a fee owner of the property. The defendant, First National, was not a fee owner, had no right to "operate" the premises as an owner, rented only a portion of a small shopping center and had subleased its right to occupy to Hartford Provision, on which it realized no annual profit. Upon the expiration of its lease, the defendant would have no further rights in the leased premises, and therefore, no remainder interest in the premises to protect and no further reason to have an interest in the operation of the premises. Where under the lease terms it could terminate a subtenant's sublease to the same premises, its exercise of that right would not seem to be CT Page 10366 logically tied to a Kendall like purpose of ownership and operation of the particular property."
The defendant contends that the 1989 Supreme Court case ofEis v. Meyer, 213 Conn. 29, 36, 566 A.2d 422 (1989), makes a critical distinction between cases like the one at bar and theKonover rule. Eis held that the "implied covenant of good faith and fair dealing is `[e]ssentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle,therefore, cannot be applied to achieve a result contrary to theclearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." [Emphasis in original.]Eis v. Meyer, supra, 16-32.
The defendant asserts that if a notice of proposed assignment or sublet was given by the plaintiff subtenant to the defendant lessee, then the clear language of the lease, for which the parties bargained gave the tenant the right to reject the proposed new subtenancy and to terminate the sublease. Since the defendant acted promptly to terminate, it is the defendant's position that it could do so acting in its own interest.
In Eis, there was an easement which by its terms ceased if the premises benefited by one easement were enlarged. The Eis
court, therefore, ruled there was no application of an implied covenant of good faith and fair dealing because by express terms of the deed, termination of the easement was required if any building on the land benefited by the easement was enlarged. The Eis court held that to imply a duty of good faith and fair dealing on the servient estate holder, who had remained silent during the building expansion, would achieve a result contrary to the express language of the easement, which by its terms required automatic termination of the easement if the holder of the dominant estate expanded any building upon the premises. In the court's opinion, Eis has distinct facts which would not exempt the present case from implying a covenant of good faith and fair dealing. While the right reserved in the defendant as sublessor to terminate the sublease is an important key in determining the issues in this case, it would not alone exempt the defendant from the duty to act in good faith, without malice, fairly and properly.
The plaintiff, on February 20, 1990, requested in writing CT Page 10367 of the defendant its consent to a sublease, pursuant to paragraph 10 of the lease. Within the fifteen days required by the sublease, the defendant, acting by George McPhillips, a vice president, refused its assent and terminated the sublease.
The plaintiff attempted to amend its complaint in the middle of the trial. It had alleged since 1990 in paragraph 8 of its complaint that "[o]n or about February 20, 1990, the plaintiff requested of the defendant its consent to a sublease, pursuant to paragraph 10 of the Sublease." It sought to avoid the binding judicial admission that it made in that pleading by an amendment alleging that its February 20 letter to the defendant was only a preliminary notice, not a paragraph 10 notice. The court denied that amendment to which the defendant had strenuously objected after finding that it was not timely and was highly prejudicial to the defendant if allowed in mid-trial.
The plaintiff claims that the written notice given it did not meet the formality requirements of paragraph 24 of the lease and paragraph 10 of the lease because McPhillips' termination letter was not directed to Hartford Provision Company, but only to Gran Central Markets, Inc. The short answer to this contention is that the plaintiff is Hartford Provision Company. In paragraph 9 of the complaint, the plaintiff pled that "[o]n or about March 6, 1990 the defendant refused to consent to the requested sublease but instead notified the plaintiff that the lease was terminated and that the premises had to be surrendered as of March 31, 1990." (Emphasis supplied.) That is a binding judicial admission. James Destruction, Inc. v. Upjohn,161 Conn. 891, 899. Therefore, whether the plaintiff received notice is not an issue in the case.
The court believes that it is confronted with two questions in light of the evidence. First, does the duty of good faith and fair dealing apply? Secondly, if it does, was it breached by the refusal to assent and subsequent exercise of the right of recapture.
The court will first address whether a duty of good faith and fair dealing is to be implied here at all. The assignment clause in the Hartford Provision lease is substantially similar to the lease language in Warner v. Konover, supra, 152 n. 1. Unlike the Eis case, in which an act of the owner in expanding any building on the premises automatically resulted by express language of the easement in terminating the easement, the CT Page 10368 respective lease and sublease agreements in Konover and HartfordProvision did not by express language provide for an automatic rejection of approval of assignment. Unlike Eis, in bothKonover and the Hartford Provision case, terms or standards of rejection of an assignment were not set out in the respective lease or sublease agreement itself. There is no sound basis, therefore, to say that the duty of good faith and fair dealing should not be applied to the Hartford Provision case, and accordingly, the court rules it applies.
The second question to be addressed involves whether the refusal to assent to assignment breached that duty. The court finds it did not.
Ultimately, the Donnelly interests, fee owner of the premises (after releasing First National Supermarket, Inc. from its lease, and after First National had itself terminated the Hartford Provision lease), entered into a lease arrangement with Hay Day Markets, the same tenant, Hartford Provision had proposed as a subtenant. There is no indication, however, that in refusing to accept Hay Day Markets as a subtenant that the defendant acted in bad faith.
 Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving `bad faith' because they violate community standards of decency, fairness or reasonableness.
 2. Restatement (Second), Contracts (1981), Sec. 205; see also E.A. Farnsworth, Contracts (1982), Sec. 7.17, pp. 526-28.
The Restatement defines three categories of restraints on alienation: (1) disabling restraints which make an attempted alienation void; (2) promissory restraints which impose contractual liability, and (3) forfeiture restraints which make all or part of the property interest subject to termination, Rest., Property Perpetuities and other Social Restrictions (1944), Sec. 404, pp. 2381-2390. The Hartford Provision sublease contains a variant of the forfeiture restraint, wherein the parties bargained in paragraph 10 to give the right to the defendant sublessor to terminate the entire leasehold interest CT Page 10369 which the tenant had if the subtenant proposed to sublet and the sublessor did not approve. "Forfeiture restraints are generally viewed more favorably than comparable disabling restraints and have gained widespread acceptance. Carma Development (California),Inc. v. Marathon Development California, Inc., 826 Pacific Rep.2d 710, 718, citing: "Rest., Property, Perpetuities and Other Social Restrictions, Sec. 404, com. c, p. 2382; Rest.2d Property, supra, Sec. 15.2, pp. 108-109, fn. 4; 5B Powell on Real Property (1991 rev.) Restraints on Alienation, Sec. 844, 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, Sec. 409, p. 596; Coskran, Assignment and Sublease Restrictions: TheTribulations of Leasehold Transfers (1989) 22 Loyola. L.A.L. Rev. 405, 453)." A disabling restraint binds the lessee to the lease throughout its term. With a forfeiture restraint, the lessor must either approve a proposed transfer, releasing the lessee from all but surety obligations, or terminate the lease obligation, releasing the party bound altogether. A forfeiture restraint merely accelerates the inevitable end of every term for years. See Carma, Id.
One commentator, Professor William J. Coskran, in an incisive analysis entitled "Assignment and Sublease Restrictions;the Tribulations of Leasehold Transfers," Loyola of LosAngeles Law Review, Vol. 22 p. 405, 415 categorizes typical lease clauses which restrict directly or indirectly a transfer of all or part of a leasehold by a tenant as follows:
 1. Silent Consent Standard. The tenant must obtain the lessor's consent to a transfer, but there is no express standard governing the lessor. The clause does not expressly require the lessor to be reasonable, nor does it expressly permit the lessor to refuse consent in his sole discretion. The Cohen and Kendall cases involve this type of clause.
 2. Express Reasonable Consent Standard. The tenant must obtain the lessor's consent to a transfer, and the lessor is expressly given sole discretion to grant or withhold consent. For example, the clause might provide that "consent may be withheld in the sole and absolute subjective discretion of the lessor."
 3. Express Sole Discretion Consent Standard.
The tenant must obtain the lessor's consent to a CT Page 10370 transfer, and the lessor is expressly given sole discretion to grant or withhold consent. For example, the clause might provide that "consent maybe withheld in the sole and absolute subjective discretion of the lessor."
 4. Express Specific Requirements. The tenant's right to transfer and the lessor's consent, are conditioned upon express specific requirements. The requirements vary depending upon the facts of the particular lease transaction. For example, the tenant and third party may be required to furnish evidence that the third party meets certain minimum credit or operational requirements.
 5. Consent Required But Exceptions. The lessor's consent is required per one of the above alternatives, but specific types of transactions are exempted from the future consent requirements. For example, an exemption for subleases to the tenant's franchisees or an exemption for transfers among related corporate entities maybe appropriate in some situations.
 6. Absolute Prohibition. Transfer is prohibited. There is no mention of consent or compliance with requirements.
 7. Possession Recovery. If the tenant wishes to transfer, the lessor may elect to recover possession of the property. The tenant is free to transfer to the third party only if the lessor chooses not to exercise that option.
 8. Profit Shift. The lessor is entitled to receive part or all of the profit generated by the transfer transaction.
The clause involved in this case falls into two of these categories, the silent consent standard and the possession recovery category, in that there is no express standard governing the sublessor's discretion to deny approval, and by its terms the sublease between defendant, First National, and plaintiff, Hartford Provision, expressly provides that the landlord may terminate in the event it receives a notice from CT Page 10371 the subtenant of a proposed sublease or assignment. The subtenant is free to transfer the possession to a sublessee or assignee only if the sublessor chooses not to exercise that option to terminate.
The plaintiff urges the court that the defendant acted in bad faith by taking advantage of the plaintiff through the forms or technicalities of the law, when in a telephone conversation, George McPhillips, a vice president of the defendant, told Alfred Marsella, a real estate manager for the plaintiff, that the sublease to Hay Day would be approved, invited a letter request, and then disapproved it, and terminated the sublease with the plaintiff. McPhillips knew almost nothing about Hay Day from the Marsella conversation beyond the fact that Hay Day was a food retailer and he did not initiate this telephone conversation with Mr. Marsella. Mr. Marsella testified that on or about February 20, 1990, he called George McPhillips to let him know that the plaintiff was discussing the sublease of the Ridgefield store to a quality food tenant, which was Hay Day, and he wanted to know, or Hartford Provision wanted to know "what he would think our chances were". Mr. Marsella had only some minor prior dealings with Mr. McPhillips before initiating this call. Mr. Marsella's "best recollection" was that he asked Mr. McPhillips "if he thought First National would have any objections to a new food store that we wanted to deal with, and then I told him the name of the store, which was Hay Day, and he indicated that he knew of Hay Day and it probably was the right type of tenant for the area, but he suggested — he also said he had no objection to it but he suggested that we should get this in writing." Marsella testified there was nothing further to the conversation. Mr. McPhillips gave credible testimony that it was not his practice to consent to a subtenant about whom he knew nothing concerning financial standing. He ultimately signed his assent to the document sent to him by the plaintiff, but it was never delivered to the plaintiff and the court finds credible McPhillips' testimony that he often signed things and researched them after his signature either by himself or sometimes with his counsel.
The court does not find after carefully weighing the testimony of both Mr. McPhillips and Mr. Marsella that any clear and definite oral commitment or promise had been made by the defendant corporation which would constitute a bad faith entrapment of the plaintiff. The court does not find that the defendant corporation intentionally gave up any right it had CT Page 10372 under the sublease contract based on this cursory McPhillips-Marsella conversation.
The defendant sublessor had reserved the right to terminate in the event of a paragraph 10 request for approval to assign the sublease or sublet. That was well within the expectation of the parties. Intent of the parties to a contract is normally gleaned from intention expressed by words or acts on which the other party has a right to rely. That intent and, consequently, any reasonable expectations of the parties, are normally determined from what was expressed in the words and acts expressed at the time the contract was made, not some later time. See Garrison v. Garrison, 190 Conn. 173. There is no evidence of bad faith or improper motive on the part of the defendant, First National. Such a termination is faithful to an agreed upon purpose found in the lease itself. The defendant terminated after having been made aware of a claim of environmental liability for a buried oil tank by the property owner. It also did so to remove a potential contingent liability, namely, its continued liability on the prime lease which required it to pay the prime lease obligations itself if the plaintiff did not fulfill its obligations on the sublease. It ended a liability it had under the prime lease to restore the premises to as good a condition as had existed where it first took occupancy of the premises under the prime lease since the owners were willing to take the premises back from First National in "as is" condition. The defendant sought to relieve itself of administrative burdens it had as a "middleman." None of these are improper motives. It was a party to a contract. It did not owe some fiduciary relationship to the plaintiff which would require it to disregard its own corporate interest or contract rights in determining whether it could exercise an express right to terminate the sublease between the plaintiff and defendant if the subtenant notified it it wished to transfer. Our developing law applicable to business torts recognizes rights an economic entity must be accorded in a system where directors and officers are bound to operate a corporate enterprise in the best interests of its own shareholders. Just as a party cannot be held to be tortiously interfering with a contract between a subsidiary and a third party, where it has legitimate economic stake to look after, AmericanProtein Corp. v. A.B. Volvo, 844 F.2d 56, 63 (2d Cir., 1988), cert. denied 109 S.Ct. 136 (1988), so, too, a party cannot be held to be acting improperly solely because it exercises a contractual right in a manner consistent with its economic CT Page 10373 stake. See also: Solomon v. Aberman, 196 Conn. 359,493 A.2d 193 (1985); Selby v. Pelletier, 1 Conn. App. 320 472 A.2d 1285
(1984). The law recognizes in many situations, that absent fraud, misrepresentation, duress, molestation, or malice a party to an agreement can act in a way consistent with its own economic interest. Thus, it has been held that a party to a contract cannot tortiously interfere with that contract. Murrayv. Bridgeport Hospital, 40 Conn. Sup. 56, 60-61, 480 A.2d 610,613 (1983); Bowman v. Grolsche Bierbrouwerij B.V., 474 F. Sup. 725,733 (D. Conn. (1979); Powell v. Feroleto Steel Co., Inc.,659 F. Sup. 303, 307 (D. Conn. 1986). Even though additional options had been purchased by the plaintiff, the two remaining were unexercised by the plaintiff at the time of the sublease termination. According to the sublease, if the assignment were approved, the only assignment which could have been made was for the unexpired term of the lease then in effect. Furthermore, the plaintiff was not left bound on the lease, and was therefore relieved of the liability the sublease required. Konover's
lease left the tenant bound on the lease whereas HartfordProvision's required release of the subtenant, Hartford, from the lease agreement if assignment were disapproved. Unlike theKonover case, the defendant was not demanding more money of the plaintiff as the price of its consent to a sublease, and therefore, more was not being demanded of the subtenant than the sublease contract required. Absent some cogent reason such as mistake or unconscionability, or bad faith, there is no reason why a court should not enforce the bargain that the parties have made. Leonard Concrete Pipe Co. v. C. W. Blakeslee Sons, Inc.,178 Conn. 594, 598, 424 A.2d 277 (1979); Mack Financial Corporationv. Crossley, 209 Conn. 163 (1988). See also Warner v.Konover, supra.
In Carma Developers (California), Inc. v. MarathonDevelopment California, Inc., supra, 718, the court held that the recapture clause of a commercial lease under which the lessor had the right to terminate the entire leasehold upon the lessee's request for permission to sublet or assign, did not violate an implied covenant of good faith and fair dealing and the implied covenant could not be read as prohibiting a party from doing that which was expressly permitted by agreement.
From all the credible evidence in this case, the court finds no breach of an implied covenant of good faith on the part of the defendant. CT Page 10374
For all these reasons, judgment is entered on the complaint for the defendant.
JUDGMENT
In accordance with the Memorandum of Decision of even date herewith, the court enters judgment for the defendant on the complaint and judgment is entered for the defendant on the counterclaim and against the plaintiff in the amount of $31,009.72.
FLYNN, J.