## E. J. ELLIOTT ET AL. *v.* RAYMOND STARON, EXECUTOR (ESTATE OF PAULINE STARON)

| Superior Court | Judicial District of Fairfield | File No. CV89257780S |
| --- | --- | --- |

Memorandum filed July 29, 1997*

*Willinger, Shepro, Tower & Bucci, P.C.,* and *Marsh, Day & Calhoun* and *Michael C. Sohon* and *Quatrella & Rizio, LLC,* for the plaintiffs.

* Affirmed. *Elliott* v. *Staron,* 54 Conn. App. 632, 736 A.2d 196 (1999).

*Horton, Shields & Cormier* and *Andre L. Nagy* and *Belinkie & Lax*, for the defendant.

STEVENS, J. This action was commenced by the plaintiffs, E. J. Elliott and John M. Elliott (lessees or plaintiffs), in March, 1989, against the defendant, Raymond Staron, executor of the estate of Pauline Staron (defendant), seeking damages arising from a lease agreement between the parties for premises at 3355 Post Road, Fairfield. The complaint is in four counts and asserts causes of action for breach of contract, tortious interference with business relationships and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The defendant has asserted a counterclaim against the plaintiffs seeking to recover attorney's fees incurred by the defendant in a prior action between the parties entitled *Elliott* v. *Estate of Galaske,* Superior Court, judicial district of Fairfield, Docket No. 227639 (November 2, 1987), aff'd, 17 Conn. App. 823, 552 A.2d 1225 (1989).

A trial to the court in the present case commenced on February 5, 1997, and the posttrial briefs were filed in March, 1997. The court makes the following findings. The defendant is the owner of the fee interest in the subject property. When the lease was initially executed in April, 1975, the lessors were Nellie M. Galaske, individually and as executrix of the estate of John H. Galaske, and Pauline Staron (lessors). The defendant is the successor of Nellie M. Galaske and the estates of John H. Galaske and Pauline Staron. He acted as Pauline Staron's authorized agent regarding the premises, and after her death he acted as executor of her estate. Andre Nagy is an attorney practicing law in Connecticut and was retained by the defendant to represent the lessors regarding the property.

On or about April 25, 1975, the defendant's predecessors entered into the lease agreement with Arthur

Treachers of New England, Inc. On May 1, 1975, a supplement to the lease was signed. The plaintiffs are the present tenants under the lease pursuant to an April 21, 1981 assignment. The plaintiffs have exercised renewal options extending the term of the lease to June 30, 2005. The plaintiffs are current in the lease payments and are in compliance with their obligations under the lease. The premises have not been rented and the plaintiffs have not received any income from the premises since 1984.

The following provisions of the lease are relevant. Paragraph four provides in relevant part: "The Lessee agrees that parcels 1, 2 and 3 shall be used for a restaurant and allied business purposes, or for any other legal purpose, subject to the approval of the Lessors, which approval shall not be unreasonably withheld. . . ."

Paragraph eight provides in relevant part: "The Lessors represent and covenant that they have fee simple title to the premises and have full right and authority to execute this lease for the term and upon the conditions herein contained, and there are no restrictive covenants, zoning or other ordinances or regulations prohibiting the Lessee's use of the premises for the purposes for which the same are hereby leased. . . ."

Paragraph nine provides: "The Lessee may from time to time, at its own expense, alter, renovate or improve the premises, provided the same be performed in a good workmanlike manner, in accordance with accepted building practices and so as not to weaken and impair the structure or substantially lessen the value of the building. All such alterations, renovations or improvements shall first require the approval of the Lessors or any one of them, which approval shall not be unreasonably withheld." Finally, paragraph fourteen of the lease provides in relevant part: "The Lessee may, without the

consent of the Lessors, assign or encumber this lease or its rights hereunder. . . ."

In November, 1985, the plaintiffs commenced a civil action against the lessors. *Elliott* v. *Estate of Galaske*, supra, Superior Court, Docket No. 227639. On November 2, 1987, the court, *I. Levine, J.*, issued a decision in favor of the defendants and explained the rights of the parties under the lease. The plaintiffs appealed from that decision, and, on January 11, 1989, the decision was affirmed by the Appellate Court. *Elliott* v. *Estate of Galaske*, 17 Conn. App. 823, 552 A.2d 1225 (1989).

In *Elliott* v. *Estate of Galaske*, supra, Superior Court, Docket No. 227639, the lessees herein also alleged that the lessors had unreasonably withheld their consent to allow the plaintiffs to make improvements on the leased premises. The facts of that earlier case will not be repeated in full because only the court's prior holding is important here. The leased premises consist of three contiguous lots, lots B, C and D. The lessors also own lot A (located to the west of lot B) and lot E (located to the south of lot B). In *Estate of Galaske*, the trial court held that the lessors reserved the following rights pursuant to the lease and an oral agreement between the parties. On lot B, the lessors reserved for their use 50 percent of the available parking spaces, except that the lessors were entitled to at least eight parking spaces. As to lot D, the lessors reserved the use of seven parking spaces. The court also held that the lessees could not make renovations on the leased premises that interfered with the entrances or exits enjoyed by the lessors' other tenants who leased premises on lot A. Lastly, the court concluded that the lessors were entitled to assert these rights regarding parking, entrances and exits, and any surrender of these rights would require a modification of the lease.

On or about July 12, 1988, while the court's decision was pending on appeal, the plaintiffs requested the lessors to approve a site plan for the use of the premises. Under this site plan proposal, twenty parking spaces were proposed for lot B and thirty-eight parking spaces were proposed for lot D. The proposal reserved for the lessors eight parking spaces in lot B and seven parking spaces in lot D. In a letter dated September 8, 1988, the lessors, through their attorney, rejected this proposal, insisting that under Judge Levine's decision the lessors were entitled to 50 percent, or ten, of the parking spaces in lot B.

The lessees, through their attorney, Michael Dowling, responded to this rejection, explaining that the site plan proposal did not reflect earlier decisions of the Fairfield planning and zoning commission, which reduced the total number of spaces available in lot B from twenty to sixteen. To address this issue and the lessors' objection, Dowling proposed to submit the plan to the town for approval, and if the zoning commission approved the plan as designed with twenty lot B parking spaces, then the lessors would receive ten spaces; on the other hand, if the zoning commission approved a total of only sixteen lot B parking spaces than the lessors would receive eight spaces. The lessees' intent in this counterproposal was to ensure that 50 percent of the total lot parking spaces would be reserved for the lessors, consistent with Judge Levine's decision.

In a letter dated September 19, 1988, Andre Nagy, the attorney representing the lessors, rejected this proposal, explaining that in light of the lessors' rights as found by Judge Levine, the lessors were not "under any obligation to authorize approval of a set of plans wherein their respective rights to parking may be adjudicated or determined by a municipal authority based upon plans submitted by your client for your client's purposes."

The lessors' response to this July, 1988 proposal was unreasonable. In the proposal, the lessees offered to give the lessors 50 percent of the parking spaces that were ultimately approved by the zoning commission, but no fewer than eight spaces, which was entirely consistent with Judge Levine's decision. The fact that the exact number of parking spaces would depend on the authorization ultimately received from the zoning commission was not significant as long as the number of spaces given to the lessors was consistent with the number they were entitled to under Judge Levine's decision.

In November, 1988, the lessees presented another site plan to the lessors. In this plan, fifteen parking spaces were designated in lot B and eight spaces were reserved for the lessors. The lessors rejected this proposal explaining that Judge Levine's decision was still on appeal and the parties' rights regarding the lease had not yet been determined in a final judgment. The lessors' position was that the parties should take no action regarding the lessees' interest in renovating and subleasing the premises until the appeal was decided unless the lessees withdrew the appeal.

In a letter dated February 7, 1989, after Judge Levine's decision was affirmed, the lessees again requested approval of the November, 1988 site plan. In this letter, the lessees again indicated that they wanted to sublease the premises immediately and that time was of the essence. The lessors, through counsel, responded to this request stating that the request for the lessors' approval was rejected because the lessees were in default under the lease. The response did not explain what the default was. The dispute regarding the alleged default was ultimately resolved, but the lessors never authorized any renovations to the property.

The lessors took the position that applications could be submitted to the zoning commission without their

signature, and, therefore, the lessees were free to submit applications to renovate the property without their approval. The lessees, however, had obtained a letter from Fairfield's zoning enforcement officer stating that the zoning commission required the signature of the property owner on zoning applications. In any event, the zoning commission would be unlikely to approve an application to renovate the property if the application was opposed by the owner, and there is no dispute that the lessors were required to sign any building permits. The lessees' expenditure of the time and expense to process a zoning application obviously made no sense if the lessors opposed the application. Thus, the lessors' position that they were not obligated to consider or approve the plaintiffs' renovation proposals because zoning applications could have been submitted without their signatures has no merit. At various times at least to November, 1994, the plaintiffs requested written approval of proposals for renovations necessary for the use or subletting of the property. All such requests were rejected by the lessors. For example, in a letter dated April 27, 1990, Dowling advised the lessors that the plaintiffs wanted to rent the property to the owner of a nearby diner who wanted to operate a restaurant at the site. The lessors were advised that the sublease would comply with the terms of the lease and Judge Levine's decision and would protect the lessors' parking rights according to the November 7, 1988 map previously provided to the lessors. As discussed previously, this map proposed a layout involving fifteen spaces in lot B for which eight spaces would be reserved for the lessors.

In a letter dated May 22, 1990, the lessors, again through counsel, rejected this April 27, 1990 proposal. They explained that the November 7, 1988 map was discussed with the defendant at his August 16, 1989 deposition, and "[t]he inquiry sought in your letter of

April 27, 1990, was directed to him and responded to by him in said deposition." Thus, the lessors never engaged in discussions with the lessees regarding the April 27, 1990 proposal or how any objections to the proposal could be addressed. They simply rejected the proposal on the basis of a deposition that took place eight months earlier.

At this deposition, the defendant provided vague and unreasonable objections to the November 7, 1988 map. For example, he demanded that the lessors receive use of a small area on the map for parking that was not designated on the map as a parking space. He demanded ingress and egress rights on lot B that would have effectively blocked off one half of this lot for his use exclusively. During the deposition, he explained that he had other questions or problems with the map that he would have to discuss with this attorney. It should also be noted that during the deposition, the defendant admitted that some of his objections were being expressed for the first time and had not been communicated to the lessees or their counsel.

At trial, Nagy testified that the November, 1988 map failed to identify parking for individuals with disabilities, altered the entrances and exits, and showed an undesignated barrier that potentially affected the lessors' rights to ingress and egress. He stated that the lessees were informed about all the concerns the lessors had with the November, 1988 map. He stated that he received no adequate response to these concerns, and he apparently did not pursue the matter. The court finds that these alleged problems were pretextual, and they failed to impair the lessors' rights as described by Judge Levine's decision. Even if this court assumes arguendo that these concerns presented bona fide problems regarding the lessors' rights under the lease, they could have been addressed and resolved by good faith discussions, which the lessors refused and failed to pursue.

The court rejects the evidence offered by the defendant to the contrary as not being credible.

Not all of the positions asserted by the lessors were unreasonable. Since approximately 1988, however, the following represents a fair summary of the lessors' responses to the plaintiffs' renovation proposals. The lessors would receive a proposal and fail to respond immediately. The lessors would reject a proposal with no explanation or with incomplete explanations. The lessors would assert their objections to proposals in a piecemeal fashion. The lessors would have objections that they would not convey to the plaintiffs, and the lessors would refuse to engage in a meaningful dialogue about their objections in a serious effort to reach a resolution.

The plaintiffs have been represented by at least three attorneys since 1988, who have all attempted, without success to acquire the approvals from the lessors necessary to renovate the property for commercial use. Two of the attorneys testified that on the basis of their efforts, negotiations and meetings in this matter, they came to the understanding that ill will between the parties and the lessors' desire for the plaintiffs to pay more rent than they were obligated to pay under the lease were the reasons why the lessors' approval was never obtained. The court credits this testimony.

I

CONTRACT CLAIMS

Counts one and three of the revised complaint allege that the defendant breached the terms of the lease. More specifically, under count one, the plaintiffs allege that the defendant breached the lease by failing to give the written approval necessary to renovate the property and by conditioning this approval on demands not war-

ranted under the terms of the lease. Under count three the plaintiffs allege that the defendant breached the implied covenant of good faith and fair dealing. The court finds in favor of the plaintiffs on these counts.

As to count one, the property cannot be used for commercial purposes without major repairs and renovations. Under the terms of the lease, such alterations and improvements require the approval of the lessors, but this approval "shall not be unreasonably withheld." As previously described, the lessors conduct in this case cannot be characterized as being "reasonable." The lessors withheld approval and asserted demands that were unreasonable and unjustified, especially, for example, the demand that a barrier be placed on lot B that would substantially impair the plaintiffs' use of this lot.

In regard to count three, the law is now well established that a commercial lease imposes a duty of good faith and fair dealing on the landlord and tenant. *Warner* v. *Konover*, 210 Conn. 150, 154–55, 553 A.2d 1138 (1989) ("landlord who contractually retains the discretion to withhold its consent to the assignment of a tenant's lease must exercise that discretion in a manner consistent with good faith and fair dealing"); 2 Restatement (Second), Contracts § 205 (1981) ("[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement").

"Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ." (Internal quotation marks omitted.) *Warner* v. *Konover*, supra, 210 Conn. 155, quoting 2 Restatement (Second), supra, § 205, comment (a). Good faith negotiations may be described as includ-

ing honest and sincere efforts to engage in discussions and pursue reasonable possibilities to resolve the matters in dispute, with the parties taking into consideration their own respective needs, requirements and legal obligations. By definition, good faith and fair dealing exclude fraud and deceit, and depending on the circumstances, may also exclude the recapturing of opportunities that have been legally foregone. See *Warner* v. *Konover,* supra, 155–56.

Certainly, the parties contemplated that the plaintiffs would be able to acquire income from the property by using or subletting the premises, and, although the lessors reserved interests in the parking areas and the right to approve renovations, the lessors' actions that precluded any beneficial use of the property were entirely inconsistent with any legitimate common purposes or expectations under the lease.

The court agrees with the defendant's point that a party to a contract is entitled to take reasonable positions to protect its interests and to resist efforts that would compromise its legal rights. The evidence here, however, establishes that the lessors acted to thwart the plaintiffs' use of the property on any basis they could find to justify their uncooperativeness. Acting in good faith involves an honest effort to explore reasonable possibilities to settle a dispute and does not involve the party's efforts to find any conceivable basis to be obstreperous.

As previously discussed, some of the lessors' positions were reasonably based, but over the years, all the lessors' legitimate concerns could have been resolved by good faith discussions. The parties' failure to reach an agreement was frustrated by the lessors' hostility toward the plaintiffs and a desire to acquire more rent from them.

II

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND CUTPA

A

To establish a cause of action for tortious interference with business relations as alleged under count two of the revised complaint, the plaintiffs must prove the existence of a beneficial relationship, the defendant's knowledge of that relationship, the defendant's intent to interfere with the relationship and an actual loss suffered by the plaintiffs. See *Solomon* v. *Aberman,* 196 Conn. 359, 383, 493 A.2d 193 (1985). This tort requires proof of "misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." (Citations omitted; internal quotation marks omitted.) *Sportsmen's Boating Corp.* v. *Hensley,* 192 Conn. 747, 754, 474 A.2d 780 (1984).

The lessors knew that the property could not be sublet without substantial renovations. Thus, they also knew that any possibility to sublet the premises would be precluded if their authorization to perform the renovations was withheld. The evidence further establishes that there were individuals committed to subletting the premises for long terms (ten years or more), but they did not and could not do so because of the lessors' unreasonable refusal to approve renovations to the property. The court finds that the lessors interfered with these potential contracts deliberately, knowingly and maliciously. More specifically, the lessors refused in bad faith to approve renovations necessary to sublease the property, knowing that their actions would preclude any subleases. A material part of the lessors' motivation was the ill will held against the plaintiffs, and a desire to acquire additional rent concessions. On the basis of these facts, the plaintiffs have met their

burden of proving the defendant's tortious interference with their business relations.

## B

CUTPA prohibits a person from engaging in "unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). For violating CUTPA, a defendant may be held liable for actual damages, punitive damages and attorney's fees. General Statutes § 42-110g.

The facts supporting the court's conclusion that the defendant tortiously interfered with the plaintiffs' business relationships are sufficient to establish that the defendant also engaged in unfair or deceptive acts in violation of CUTPA. As explained by the Supreme Court in *Sportsmen's Boating Corp.* v. *Hensley*, supra, 192 Conn. 757, it is "difficult to conceive of a situation where tortious interference would be found but a CUTPA violation would not," and this case does not present such a situation.

## III

## DAMAGES

The plaintiffs have met their burden to provide a sufficient basis for the court to make a reasonable estimate of the amount of lost profits caused by the lessors' wrongful actions. See generally *Gargano* v. *Heyman*, 203 Conn. 616, 620–21, 525 A.2d 1343 (1987). The evidence establishes that offers to sublease the premises ranged from $50,000 to $75,000 per year on a triple net basis (taxes and expenses paid by the subtenant), including renovation costs. The plaintiff John M. Elliott testified that at the present time the average rental value of the property is $70,000 a year on a triple net basis. On the basis of this evidence, and considering that the average yearly rental would have been less when this controversy began than at the present time, the court

finds that the average yearly value of sublease rents lost by the plaintiffs was $60,000. Under the lease, the average yearly rent, paid by the plaintiffs since 1988 was $18,000. The plaintiffs' lost profits therefore are $42,000 a year. As the defendant's wrongful actions began in 1988, the total lost profits over eight full years total $336,000. The court further concludes that the plaintiffs' request for attorney's fees should be granted and finds that the recovery of $15,000 is reasonable.

The court rejects the plaintiffs' claim that their monetary recovery should include all rent and tax payments paid or to be paid by them under the lease. The plaintiffs are entitled to reasonable compensation for the losses caused by the defendant's wrongful actions. Under CUTPA, the plaintiffs are entitled to "actual damages." General Statutes § 42-110g. These damages are appropriately and fully represented by the plaintiffs' recovery of lost profits. The court also refuses to accept the plaintiffs' claim that the damages should be calculated through June 30, 2005, the end of the lease term. The court rejects the plaintiffs' argument that they cannot find any use or locate any subtenant for the property for the balance of the lease term. The court will not assume, as requested by the plaintiffs, that the defendant will continue the wrongful conduct or that the plaintiffs should be relieved from any obligation to mitigate any future losses.

## IV

## COUNTERCLAIM

The defendant seeks the recovery of attorney's fees based on expenses incurred in successfully defending the *Estate of Galaske* case decided by Judge Levine.[1]

---

[1] In the defendant's posttrial submissions, the defendant also requests recovery of attorney's fees incurred in the present case. In addition to the reasons discussed previously, this request is denied because it was raised neither in the defendant's counterclaim nor during the trial.

The attorney's fee clause of the lease provides the following at paragraph twenty-seven: "The Lessee covenants that in the event the Lessors are required to employ an attorney in order to enforce any provision of this lease or to collect any rent due hereunder, the Lessee shall pay a reasonable attorney's fees as part of its obligation hereunder."

The defendant did not assert any counterclaims in *Estate of Galaske*. The defendant also did not retain counsel to "enforce" affirmatively any particular provision of the lease as contemplated by the lease's attorney's fee clause, but retained counsel to respond to the plaintiffs' claims and protect its interests under the lease. There may be circumstances where an action brought by a tenant so involves the essence of the parties' agreement that a landlord's defense may be viewed as an "enforcement" of the lease, but the facts here do not present such a case. Attorney's fee clauses should be construed to encompass only areas within the reasonable contemplation of the parties; see *Voll* v. *Lafayette Bank*, 223 Conn. 419, 426–27, 613 A.2d 266 (1992); and, if the parties intended the landlord as the prevailing party in any litigation under the lease to recover attorney's fees, then they could have drafted the attorney's fee clause in this manner. Furthermore, the defendant has offered insufficient evidence to allow the court to evaluate the reasonableness of the fees sought for the services rendered in this prior litigation.[2]

## V

## CONCLUSION

Therefore, judgment is rendered in favor of the plaintiffs and against the defendant on the complaint, and the

---

[2] The plaintiffs' argument that the defendant's counterclaim is barred by res judicata is rejected because the plaintiffs failed to assert the claim in their pleadings or during the trial. See Practice Book § 164; *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.*, 195 Conn. 60, 64 n.3, 485 A.2d 1296 (1985).

plaintiffs are awarded damages against the defendant in the amount of $351,000; and judgment is rendered in favor of the plaintiffs and against the defendant on the counterclaim.